THOMAS A. EDISON·

·v.

EDISON POLYFORM AND MANUFACTURING CO.

[Decided July 22d, 1907.]

1. Where the original assignment of a preparation compounded by assignor to relieve neuralgic pains gave no authority to use either the name or picture of assignor, that assignor may have otherwise given a license to use his picture and certificate to his assignees, being persons whom he knew and in whom he reposed confidence, would not entitle subsequent assignees, whom he did not know, to the same privilege.

2. An injunction will lie to restrain the unauthorized use of one's name by another as a part of its corporate title, or, in connection with its business or advertisements, his picture and his pretended certificate that a medicinal preparation, which such other is engaged in manufacturing, is compounded according to the formula devised by him, though he is not a business competitor.

On final hearing on pleadings and proofs.

*Mr. Robert H. McCarter* and *Mr. Frank L. Dyer* (of New York), for the complainant.

*Mr. Charles E. Hill* and *Mr. Meier* (of New York), for the defendant.

STEVENS, V. C.

The complainant, who is an inventor of electrical instruments and processes, and enjoys in this regard a world-wide reputation, early in his career compounded a medicinal preparation intended to relieve neuralgic pains by external application. It was first made for the personal use of Mr. Edison and his assistants, and not for sale. In the year 1879 a Mr. Lewis and a Mr. Jacobs went to his laboratory in Menlo Park to examine his inventions. While there Mr. Edison happened to mention the fact that he had been a sufferer from facial neuralgia, and that he had made

a preparation which he had called "Polyform" and which he had found to be a good painkiller. Lewis and Jacobs were so impressed with its merits that they asked him to sell it. He finally agreed to sell for $5,000. The arrangement was that he would apply for a patent and execute an assignment. The patent does not appear to have been issued, but a written assignment of his right to it and to the preparation was made on September 2d, 1879. On November 7th, 1879, a company, called the "Menlo Park Manufacturing Company," in which Mr. Edison had no interest, was organized under the laws of Connecticut, and it proceeded to manufacture and sell the preparation. It did so for several years on a small scale, with little or no success, and finally failed. It was succeeded by a corporation, organized on September 3d, 1886, under the laws of Maine, called the "Edison Polyform Company." This company, too, met with little success. It was, in turn, succeeded by a New York company, which did nothing. Finally a New Jersey company, the present defendant, was, on May 23d, 1893, formed by certain gentlemen living in Chicago. This corporation is now carrying on the business of making and selling Polyform in that city. The present suit was commenced October 9th, 1903. There has been some delay in prosecuting it, caused, I suppose, by the death of complainant's solicitor. I do not think, however, that, as the case stands, there is any question of laches. The case must be decided on its merits.

The prayer of the bill is that the defendant company may be restrained from using the name "Edison" as a part of its corporate title or in connection with its business, or in connection with any advertisements circulated or published by it, and from holding out that complainant is the inventor or manufacturer or seller of the preparation sold by defendant.

What the defendant company is doing is to manufacture and sell a liquid preparation containing apparently all but one of the drugs (viz., morphine) mentioned in Mr. Edison's formula. On each bottle is a label containing, on the one side, directions for use, and, on the other, a picture of Mr. Edison and the following words: "Edison Polyform. I certify that this preparation is compounded according to the formula devised and used by myself. Thos. A Edison." Mr. Edison testifies that he has never

authorized the use of his picture and that he has never made or authorized this certificate. As to the present defendant, there is absolutely no pretence that he has. As to the predecessors of the defendant, there is evidence that the picture and certificate were used. But it would seem that when Mr. Edison heard that they were, he objected. He says that he objected to any use whatever of his name or picture. Mr. Grant says, but does not show by competent proof, that he objected only to the representation of machinery around the head. I do not regard the matter as important, because even if Mr. Edison had given a license to use a picture and certificate to the first vendees, persons whom he knew and in whom he may have reposed confidence, it would not, by any means, follow that others, unlicensed, and whom he did not know, would possess the same privilege. In the original assignment of the formula no authority whatever to use either name or picture was conferred.

The regularity of the assignments to the successive corporations was attacked. They appear to be, in some respects, defective, but I do not apprehend that it makes any difference, so far as the present bill is concerned, whether the title of the defendant is or is not perfect. The decision turns upon quite a different point.

The cases relating to the law of unfair trade have no application. They decide, merely, that a trader or manufacturer has no right to put off his goods as the goods of his competitor. The defendant does not put off his goods as being of Mr. Edison's manufacture. It asserts that it is itself the maker of them. What it does, however, falsely declare, is that it is Mr. Edison who is certifying that the preparation which the company is making and selling is made according to the Edison formula. It is, by its corporate name, by the certificate and by the picture, holding out that Mr. Edison is connected with the enterprise and supervising its work. The question is whether Mr. Edison is without standing to complain because he is not a business competitor.

*Clark* v. *Freeman,* 11 *Beav.* 112, and *Dockrell* v. *Dougall,* 78 *L. T.* 848, may be thought to favor defendant's contention. In the first case Lord Langdale refused an injunction to prevent

a druggist from selling a quack medicine which he called "Sir James Clarke's Consumption Pills" under the false representation that it was prepared by or under the direction of the eminent physician, Sir James Clark. The decision was that inasmuch as Sir James was not engaged in the business of selling pills, no injury was done to his property of which a court of equity could take cognizance. *Dockrell* v. *Dougall* differs from *Clark* v. *Freeman* in the circumstance that the druggist who was selling a drink which he called "Jellico," under the representation that Doctor Dockrell had recommended it, was, in point of fact, telling the truth. The complaint was that he was not *authorized to* use the doctor's name in his advertisements; that the doctor had done nothing more than make the statement advertised, in private conversation, without any idea that what he said would be thus utilized. Here, too, an injunction was refused. Whatever view may be taken of the soundness of the conclusion reached by Justice Ridley in *Dockrell* v. *Dougall,* it is certain that the decision in Sir James Clark's case was wrong. In *Maxwell* v. *Hogg, L. R. 2 Ch. 307,* Lord Cairns said that it had always appeared to him that it might have been decided in the plaintiff's favor on the ground that he had a property in his own name, and Lord Selborne in *In re Riviere's Trade Mark, 26 Ch. Div. 48,* said that it had seldom been cited but to be disapproved.

The leading case on the other side of this question is *Routh* v. *Webster, 10 Beav. 561.* There the provisional directors of a joint stock company had, without plaintiff's authority, published a prospectus stating that he was a trustee. Lord Langdale granted an injunction on the ground that the company was representing the plaintiff as responsible in their speculations in a way calculated to involve him in all sorts of liabilities.

In *Dixon* v. *Holden, L. R. 7 Eq. 488,* Vice-Chancellor Malins restrained the publication of a notice stating that plaintiff was a partner in a bankrupt firm. Of this case it was said by Lord Cairns in the subsequent case of *Prudential Insurance Co.* v. *Knott, L. R. 10 Ch. App. 142,* that while he did not agree to the reasoning of the vice-chancellor, he did not mean to say that the decision itself was not capable of being maintained.

Somewhat analogous to the last case is that line of cases which holds that where a business (including the good will) is sold, the vendee may not use the vendor's name in such manner as to expose the vendor to liability. *Thynne* v. *Shove, 45 Ch. Div. 577; Burchell* v. *Wilde, 1 Ch. 552 (1900).*

The latest English case that I have been able to find on the very question here presented is *Waller* v. *Ashton, 2 Ch. 282 (1902).*

There a dealer advertised a cycle which he called "The Times Cycle." Among other things in his advertisement were statements to the effect that the "Times" cycle was the only cycle that could be obtained on the "Times" (meaning the "London Times" newspaper) system of payments. There was a manifest attempt to suggest in other ways, without expressly affirming that the "London Times" was connected with the venture. An injunction was granted on the authority of *Routh* v. *Webster, supra,* on the ground that it appeared that there was a reasonable probability that that newspaper might be exposed to liability, that it might possibly be held responsible if it should not take steps to disconnect its name from the advertisements after they had been brought to its attention. The distinction made was between a liability that was merely shadowy and one that carried with it a reasonable probability of litigation or pecuniary loss.

Passing such cases as *Prince Albert* v. *Strange, 1 Macn. & G. 25; 2 De G. & S. 652; Pollard* v. *Photographic Company, 40 Ch. Div. 345; Dentacura Company* v. *New Jersey State Dental Co., 57 N. J. Eq. (12 Dick.) 593; 58 N. J. Eq. (13 Dick.) 582,* which were decided upon the ground of implied contract or breach of confidence, grounds wanting in the present case, I come to the American cases on the subject. They are comparatively few in number. Two of them, *Schuyler* v. *Curtis, 147 N. Y. 434,* and *Atkinson* v. *Doherty, 121 Mich. 372,* are plainly inapplicable. Aside from the *dicta* in the latter, the point really decided in both was, that a man's reputation does not, on his death, descend or pass like an asset in such manner that the widow or a relative can sue to protect it from defamation.

In *Roberson* v. *Rochester Folding Box Co., 171 N. Y. 538,* however, the suit was brought on behalf of a living person, a

young lady under age, to restrain a flour company from putting her likeness upon prints advertising its flour. The allegation admitted by the demurrer was that the company was printing, selling and circulating twenty-five thousand of these likenesses, with the result of humiliating her and of causing mental distress and physical sickness. A bare majority of the court of appeals overruled the decision of the appellate division and held that no cause of action was set forth in the complaint. This case resembles the case in hand in that the defendant is here seeking to make an unauthorized use of Mr. Edison's likeness. It differs from it in the fact that no attempt was made to induce the public to believe that the person depicted was recommending the flour. This case cannot be sustained on principle, and has been disapproved by the supreme court of Georgia in *Pavesich* v. *New England Life Insurance Co., 122 Ga. 190,* and by our own court of errors and appeals in *Vanderbilt* v. *Mitchell,* not yet reported. If a man's name be his own property, as no less an authority than the United States supreme court says, it is (*Brown Chemical Co.* v. *Meyer, 139 U. S. 542*) difficult to understand why the peculiar cast of one's features is not also one's property, and why its pecuniary value, if it has one, does not belong to its owner rather than to the person seeking to make an unauthorized use of it. If the mere exhibition of one's face to one's friends and to others on the public streets be a publication for all purposes, then that line of cases, of which *Pollard* v. *Photographic Company* is an example, was wrongly decided, for there could be no implied contract or confidence to keep that private which was already public property.

That the subject is attended with difficulty and that the line between what the court will restrain and what it will not restrain is hard to draw with absolute precision is undoubted. This is well illustrated by the case of libel. If you call a business man a thief, or a physician a quack, in a printed publication, you, undoubtedly, do that which tends, and very directly tends, to diminish his earnings, and yet all the authorities, up to this time at least, agree that because libel is a crime and is actionable at law, equity will not interfere. *Prudential Assurance Co.* v. *Knott, L. R. 10 Ch. 142,* is an illustration. There,

the defendant had published a pamphlet, in which he charged the plaintiff company with reckless management, and with being in a state of insolvency. On bill filed alleging the representation to be untrue, and further alleging that the company was, in fact, prosperous and solvent, and that the continued publication of the pamphlet would damage the company's business and diminish its profits, an injunction was refused by the vice-chancellor and by the lords-justices, on appeal. The decision was put upon the ground that the pamphlet, if its statements were untrue, was libelous and actionable at law, and yet Lord Cairns said, in giving judgment, that there were publications which a court of equity would restrain, and that such publications would be restrained none the less because they happened also to be libelous. He expressly dissented, however, from Vice-Chancellor Malins' view, that reputation was property, and that it might, on that ground, be protected by injunction. It would seem that the right of the citizen to have his publication passed on by a jury is, to some extent at least, responsible for the rule. Liberty of speech and of the press are guaranteed by the constitution, and the question of their abuse is committed to that body.

There must be limits to the so-called right of privacy. It is certain that a man in public life may not claim the same immunity from publicity that a private citizen may. *Corliss* v. *Walker Co., 64 Fed. Rep. 280,* and as far as my researches have extended, I do not find that it has yet been decided that injury to property in some form is not an essential element to relief. It may, at times, have been a matter of doubt whether what was called "property" was really such, and whether the injury thereto, actual or apprehended, was not so "shadowy" as to be incapable of judicial cognizance, but still the criterion was always injury to property or to property rights. It is to be noted, however, that the insignificance of the right, from a pecuniary standpoint, does not always bar relief. Thus, the report of an association of dentists (*New Jersey State Dental Society* v. *Dentacura Co., 57 N. J. Eq. (12 Dick.) 594*), the exhibition of one's photograph (*Pollard* v. *Photographic Company, 40 Ch. Div. 345*), the publication of a private letter, which, as

a literary production may be worthless (*Folsom* v. *Marsh, 2 Story 100; Boosey* v. *Jeffreys, 6 Exch. 583*), are accorded the same protection as the lectures of a professor (*Abernethy* v. *Hutchinson, 3 L. J. Ch. 209*), the catalogue of a prince's etchings (*Prince Albert* v. *Strange, 1 Macn. & G. 25*), and the currency of a foreign state (*Emperor of Austria* v. *Day, 3 De G. F. & J. 217*).

I think that, under the above authorities, the complainant in the present case is clearly entitled to an injunction to restrain the unauthorized use of his name, his picture and his certificate. The possibility of injury, because of their use without apparent objection on Mr. Edison's part, is quite as great as it would have been in the *"Times" Case* had Mr. Walter stood by and allowed the advertisement of the bicycle with what seemed to be a "Times" endorsement. I regard the case of *Vanderbilt* v. *Mitchell*, just decided by the court of appeals, as conclusive. That court, as I have said, condemned *Roberson* v. *Rochester Folding Box Co.* and cited, with approval, *Routh* v. *Webster* and *Walter* v. *Ashton.*

It appeared in *Vanderbilt* v. *Mitchell* that complainant's wife, having had born to her, two years after her marriage, a son, who was not complainant's son, falsely stated to the attending physician that the complainant was the father of the child. This statement was credited by the physician, who inserted it in his birth certificate, sent by him to the bureau of vital statistics, where it was recorded. The record, by the terms of our statute, is *prima facie* evidence of the facts therein stated. The complainant prayed that this fraudulent record might be canceled, and that an injunction might issue restraining both mother and child from claiming thereunder the status, name or property of a child lawfully begotten by complainant. The defence set up was that complainant did not show that any of his property rights had been affected, and such was the decision of Vice-Chancellor Garrison, but on appeal it was held that the complainant was entitled to relief. It was pointed out by Judge Dill that, inasmuch as the statute made the recorded certificate *prima facie* evidence of the facts stated in it, it could be used as evidence in a suit brought against the

complainant for necessaries furnished to the child. This of itself brought. the case well within the ruling in *Routh* v. *Webster, supra.* It was a false statement which exposed the complainant to the risk of pecuniary liability. But the court went further. It appeared that the complainant was a beneficiary of a vested remainder in land, under a trust which was being executed according to the laws of New York. Under the laws of that state, a man cannot devise more than half of his estate to charity where he leaves (*inter alia*) a child. His right to make an absolute devise of his property was thus threatened, and the impairment of *this* right was held to give him a standing in a court of equity to attack the certificate. Judge Dill, in concluding his illuminating opinion, said that the question whether the bill might not have been rested on the ground of an interference with *personal* as contradistinguished from property rights was not decided, for the reason that the case "presented the property feature to an extent sufficient to satisfy even the rule adopted by the court below."

The court of appeals has thus emphatically declared that the term "property right" is not to be taken in any narrow sense, that the tendency of equity, in cases of this description, should be to extend rather than to restrict the jurisdiction. Judge Dill says: "From time immemorial it has been the rule not to grant equitable relief where a party praying for it had an adequate remedy at law; but modern ideas of what are adequate remedies are changing and expanding, and it is gradually coming to be understood that a system of law which will not prevent the doing of a wrong, but only affords redress after the wrong is committed, is not a complete system, and is inadequate to the present needs of society."

It is difficult to imagine a case in which preventive relief would be more appropriate than the present. In a perfectly unauthorized way, a certificate falsely purporting to be made by Mr. Edison, and also false in fact because the preparation is not compounded with *all* the ingredients of the formula, is put, by a company bearing Edison's name, upon every bottle of Polyform which it sells. That there may be no mistake as to who is intended, the certificate is accompanied with a likeness.

I think an injunction should be granted restraining the defendant company from holding out, either in the name of the company, or by certificate, or by pictorial representation, that Mr. Edison has any connection with, or part in, the complainant's business. I cannot divorce the company's name from the other parts of the representation. It is, as the evidence stands, part of the fraudulent contrivance. The abstract question whether a company can innocently use, as a part of its title, the name of a distinguished living character, is not before me for decision, and no opinion is expressed about it.