**INTERPACE CORPORATION, Plaintiff,**

v.

**LAPP, INC., Defendant.**

**Civ. No. 79–2766.**

United States District Court,
D. New Jersey.

Nov. 18, 1982 *.

Muriel B. Kaplan, Bloomfield, N.J., Andrew V. Galway, Jersey City, N.J., and Susan L. Cohen, New York City, of counsel, for plaintiff.

Daniel H. Bobis, and David A. Jackson, Popper, Bobis & Jackson, Newark, N.J., for defendant.

## OPINION

BIUNNO, Senior District Judge.

This is a "name" case, a replay of the kind of problem courts have long struggled to solve effectively and fairly. See, for instance, *Howe Scale Co. v. Wyckoff, etc.,*

* Reversed, 721 F.2d 460 (CA 3, 1983) No. 83–5036

(November 18, 1983).

198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972 (1905) ("Remington"); *Hilton v. Hilton*, 89 N.J.Eq. 182, 104 A. 375 (E & A 1918); 89 N.J.Eq. 472, 106 A. 139 (Ch.1919), aff'd., 90 N.J.Eq. 564, 107 A. 263 (E & A 1919); *Hat Corp., etc. v. D.L. Davis Co.*, 4 F.Supp. 613 (D.Conn.1933) ("Dobbs"); *Chas. S. Merton & Co. v. Percy Merton, Inc.*, 103 N.J.Eq. 380, 143 A. 515 (Ch.1928); *Elgin National Watch Co. v. Illinois Watch Case Co.*, 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365 (1901); *American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 53 N.E. 141 (1899); *Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co.*, 69 N.J.Eq. 159, 60 A. 561 (Ch.1905).

This case is not one calling for an evaluation of similarities or differences, as between "Cottolene" and "Chefolene", *N.K. Fairbanks Co. v. Ogden, etc. Co.*, 220 F. 1002 (D.Utah, 1914); or between "Havoline" and "Valvoline", *Valvoline Oil Co. v. Havoline Oil Co.*, 211 F. 189 (D.N.Y., 1913); or between "Kidde-Koop" and "Kumfy-Crib", *Trimble v. Woodstock Mfg. Co.*, 297 F. 524 (D.N.Y., 1923), aff'd., 297 Fed. 529 (CA 2, 1924).

Rather, the name's the same; in both cases it is "Lapp". And, while the name is not as common here as "Johnson", see *S.C. Johnson & Sons, Inc. v. Johnson*, 116 F.2d 427, at 430 (CA 2, 1940), it is nonetheless a surname.

At one time, the view was that the rule in these circumstances was fixed and immutable. As was said in *Stix, Baer & Fuller Dry Goods Co. v. American Piano Co.*, 211 Fed. 271, at 274 (CA 8, 1913):

"It is now settled beyond controversy that a family surname is incapable of exclusive appropriation in trade. The right of every man to use his own name in his business was declared in the law before the modern [sic] doctrine of unfair trade competition had arisen."

Or, as was said earlier in the *Howe Scale* case, supra., involving the "Remington" family surname in connection with typewriters,

"We hold that, in the absence of contract, fraud or estoppel, any man may use his own name, in all legitimate ways, and as the whole or part of a corporate name" 198 US at 140.

The modern view is not that rigid. If the personal name has come to develop secondary meaning, to serve as an identification of origin (and thus part of the "good will" built up in time), even personal names, geographic names, descriptive names, and the like may be entitled to protection. While broad generalizations are not possible because each case will turn on its own facts, the concept was well expressed in *American Waltham*, supra:

"It is true that a man cannot appropriate a geographical name; but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line."

These common law views are substantially codified in the Lanham Act. Thus, 15 U.S.C. § 1052, provides in paragraph (e) that registration on the principal register may be refused where the mark

(1) is merely descriptive of the goods; or

(2) is primarily geographically descriptive; or

(3) is primarily a surname.

Paragraph (f), which appears to apply only to paragraph (e), however, allows registration of a mark which has become distinctive of the applicant's goods in commerce, which looks like a legislative draftsman's way of referring to secondary meaning.

There are countless well-known examples. "Westinghouse" derives from George Westinghouse, who invented an air brake, railway signals, engines and turbines, hydroelectric and other alternating current generators for the long-distance transmission of electric energy.

Isaac Merritt Singer's name is on the well-known sewing machine, with which it has been associated since the middle of the 19th century. [One author asserts that Mr. Singer's widow was the model for Bartholdi's famous statue in New York harbor. See Birmingham, "Life at the Dakota", Random House, 1979, p. 29]

Thomas Alva Edison's name acquired secondary meaning in connection with a host of products he invented and manufactured. Yet, although he had devised the formula for a product, he was entitled to prevent the unlicensed use of his name, picture and testimonial when that product was made and marketed by another, *Edison v. Edison Polyform Mfg. Co.*, 73 N.J.Eq. 136, 67 A. 392 (Ch.1907).

Henry Ford, Walter P. Chrysler, the Dodge brothers, Herren Daimler and Benz, and countless others put their names on the radiators and hubs of automobiles they made, and a court would be hard put today, after millions of sales over decades, to recognize another Ford, another Chrysler, another Dodge. The designation of origin for these names is too deep and too strong to allow another, even using his own name, to so identify his product. The origin of such names after a lifetime of use becomes historical, and what had been a surname becomes an anonymous identification of source and origin. When the quality and reliability are high, the secondary meaning becomes a valuable component of good will.

In other instances, a surname becomes part of the language itself and is available for everyone to use freely. This was the case with Count Alessandro Volta, Professor Andre Ampere, Professor Georg Ohm and James Watt, for examples.

The "Lapp" surname as used by plaintiff was used in business from 1916, when John S. Lapp formed The Lapp Insulator Co., Inc., with a plant in LeRoy, N.Y., where he was joined by his brother, Grover Lapp, the next year.

The name was used in connection with the manufacture and sale of electrical insulators made of ceramic, and associated items such as hardware. For a time, the company also made electrical capacitors under the name Lapp, but that branch of the business has been sold off without including any right to use the Lapp name.

■ Federal trademark registration was applied for June 30, 1952, and the trademark "Lapp" was registered November 24, 1953 as Registration No. 582,766. (Exh. P. 32). The statement on registration is that the trade-mark was first used on insulators in 1927, and first used in commerce interstate the same year. The mark is claimed to have become distinctive of the applicant's goods through substantially exclusive and continuous use for the 5 years before application filed. Such use gives rise to a statutory level of "prima facie evidence" of secondary meaning despite the fact that the trademark is otherwise primarily a surname, see 15 U.S.C. § 1052(f).

The registration was for use with electric insulators and electric condensers (capacitors) in "Class 21, Electrical apparatus, machines, supplies."

The Lapp Insulation Company, Inc. was later acquired by Interpace Corporation, and merged into the latter on June 27, 1969, Exh. P–6, since which time the operation has continued as the Lapp Division of Interpace Corporation.

The federal registration is owned by Interpace and was renewed by it for 20 years from November 24, 1973, Exh. P–39.

Sales by the Lapp Division in recent years have been of the order of $55. to $73. million a year.

The earliest market when the business began was for the telegraph and telephone industry to minimize current leakage losses from outdoor wiring in wet weather. As knowledge and skills improved, ceramic insulation products were developed for the radio industry and the electrical power industry. The line of products today is quite broad, going up to ceramic insulators for experimental fusion reactors of the Tokamak type.

Of about 3,000 customers, the largest group is composed of "original equipment manufacturers", OEM's, who buy components or make components to manufacture their own final products. Examples given are manufacturers of electrostatic precipitators, industrial X-ray equipment, switches and switch gear for electric utilities, circuit breakers, industrial and utility transformers, radio and TV broadcast equipment, switchboards, rail electrification (trains, trolleys, buses) both catenary and third-rail types, linear accelerators, cranes, and many others, including a specialty glaze on a ceramic product for the electronics industry that is under development.

The next largest group of customers are made up of electric utility companies, whose major purchases are of insulators for transmission and distribution lines.

Next comes a group referred to as engineering consultants, who render professional services to a wide range of clients, covering a range from specific construction projects to engineering design and procurement for manufacturing or production purposes. This class generally works on the basis of specifications to be met, searching for and either recommending or procuring a given manufacturer's product as meeting those specifications.

Among the various products in the line there is a category called "entrance bushings", which consist of not only a ceramic insulator but also a conductor passing through its center, so that it can provide an electrical path for connecting a wire outside a container, such as the metal shell of a transformer, and a wire inside that container. These are both high and low voltage types, and will be mentioned again later.

The defendant, Lapp, Incorporated, is a New Jersey corporation formed in 1976, with its facility in Fairfield, N.J. Through common stock ownership it is related to or affiliated with several West German companies: Lapp, Stuttgart, GmbH, and U.I. Lapp, A.K. The group of German companies was formed in about 1957 by one Oskar Lapp, who is still active, primarily to manufacture flexible cables for machine tools in order to replace the rigid metal conduit and wiring traditionally used.

The Gmbh entity is a manufacturer, drawing fine wire from copper bars, forming flexible conductors by twisting a number of wire strands together, extruding these conductors to coat them with insulation of various colors, and then combining and twisting a number of color-coded insulated conductors and extruding them with a jacket or sleeve. Some types are covered with a basket-weave tinned wire to form a flexible electrical shield.

U.I. Lapp, K.G. (named after Oscar Lapp's wife, Ursula Ida) is the sales unit. It markets the products made by the GmbH unit, and also other wire and cable products manufactured by others, such as Siemens, and sold under the Lapp name.

Until the defendant Lapp, Incorporated was formed and started up, sales to the U.S.A. were made by U.I. Lapp KG to customers with whom contact had been made at trade fairs, for example, by direct contact. Some attempts were made to use manufacturers representatives in the U.S.A. but these were not successful.

The insulated wire and cable products sold by U.I. Lapp KG, whether made by Lapp GmbH or others, are not produced and certified to specifications of Underwriters Laboratories (UL), but to European standards referred to as VDE, for which the working voltages and test voltages are somewhat lower than under UL standards. To the extent that the European products were sold to U.S. customers by U.I. Lapp KG and are now sold by Lapp, Incorporated, they are sold to customers who incorporate these wire and cable items into products to be shipped to and sold in European markets where the VDE specifications are called for.

The pages of product listings in the Thomas Register, Exh. P–10, do show some items such as hook up wire (p. 4233) and audio cable (p. 4234) for which UL listing is indicated. These are rated 200, 300, 350

and 600 volts, which evidently contradicts the testimony of the witness Voosen (Tr. p. 506) that there is no Lapp wiring with the name on it for use over 50 volts that is approved by UL for use in the United States. This contradiction was clarified on cross-examination when it was explained that these items do not come from U.I. Lapp KG but are bought from someone else, whose name is on the box although Lapp's name is on the invoice. See Tr. pp. 512–514.

What this means, of course, is that the defendant Lapp, Incorporated is not only the U.S. sales outlet for the German companies but also acts as a wholesaler for the goods of others which it sells under its own name. It also means that on the present record it appears that wires and cables shipped from Germany, whether they be Lapp-made or purchased from sources like Siemens, are sold in the U.S.A. to O.E.M.'s or equivalent for use in products to be sent back to the European market.

While the record at trial is not explicit on the point, it does indicate that the practice of buying wire and cable meeting U.L. specifications from other manufacturers (presumably in the USA) and listing the items in the Thomas Register as though they were Lapp products (which they are not) is of relatively recent vintage, and certainly not earlier than when defendant Lapp, Incorporated set up shop in New Jersey, in or after 1977.

The German sales company, U.I. Lapp K.G., has also registered its trademark overseas, first in Germany in 1963 (with renewal in 1975), and then during 1980 in Benelux, France, Italy, Austria, Sweden, Switzerland and Spain, and during 1981 in Denmark and Japan. These overseas registrations have no legal force in respect to U.S. sales, of course, and for all registrations except the German one, the task was attended to only after this suit was filed in late September, 1979.

The mark registered is a circle within a square, with 5 small circles arranged 72 degrees apart within the large circle to form a pentagon array. This portrays the cross-section of a 5-conductor cable. Across the bottom of the square and below the circle appear the words "LAPP CABLE" in the appropriate language for the country of registration. In Germany, for example, it is "LAPP KABEL". In France, it is "CABLE LAPP". In Italy it is "LAPP CAVI". It is this figure, with the words below, that the transcript describes in words as "Lapp Cable and Design".

In printing catalogs, however, the German and U.S. companies display the phrase "Lapp Cable" very prominently and apart from the trademark described above, so that the name Lapp stands out.

On cables made at Lapp GmbH, Stuttgart, it is evidently the practice to emboss the name LAPP and the location STUTTGART on the surface of the outermost jacket whenever possible. If the type of cable has a designation like "Oilflex", for example, that will also be embossed. This embossing is repeated along the length of the product, less than a meter apart. Evidently the trademark itself is not so embossed.

For products where these designations cannot be embossed, such as cable covered with a braided shield, or cable covered with a transparent jacket, or cable manufactured by another (such as Siemens), the practice is to attach tags or print the name in ink along the cable, put the name on the reel and on the box as well.

Methods of sale used by the two sides are much the same. Some customers are serviced by company salesmen, some by manufacturers representatives, and others by wholesalers and distributors. The geographic sales areas have largely been different, with plaintiff marketing here and the German companies mainly in Europe. While there were sales to U.S. customers before defendant was formed, these evidently were on a direct inquiry basis and without any general advertising in the U.S. Since defendant was formed, it has taken space in the Thomas Register, and also has run ads in trade publications.

A marketing expert who testified for plaintiff undertook an analysis of plaintiff's customers, and then an audience profile of the 5 trade publications defendant uses for ads. This study was made in terms of the code numbers for standard industrial classifications (SIC numbers) as used for statistical purposes.

The study does indicate that the trade publications in which defendant advertises will reach engineers, purchasing agents, and the like, at the kinds of organizations with which plaintiff deals, and since the name "Lapp" is the same, this fact is in itself evidence of likelihood of confusion. See *American Plan Corp. v. State Loan etc. Corp.*, 365 F.2d 635 (CA 3, 1966); *Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp.*, 109 F.2d 35 (CA DC, 1939).

At the same time, the study does not indicate the degree of common exposure, or the extent to which actual or potential customers of plaintiff have actually considered buying cable from defendant.

The witness Sullivan, who had been a purchasing agent at RCA at one time and was familiar with plaintiff's insulators and name, testified that he needed quotations for power cable and looked up Thomas Register for company names and addresses. He saw defendant's name there and assumed it was the same Lapp he had bought insulators from in the past, as it seemed logical to offer both insulators and wire or cable.

His request for quotation (RFQ), which is attached to Exh. P–13, shows that he wrote to defendant about April 23, 1982, at its former address. He testified that the letter came back, that he had a new letter typed with the same date, and readdressed to defendant at plaintiff's address in LeRoy, N.Y., where it was received May 6, 1982.

The incident is an example of multiple confusion since the desired cable, while required to meet certain German standards for overseas use, was of a kind that defendant does not make at all, though it is of the kind that plaintiff's insulators are designed to support. Thus, the request was one that neither party could fill.

Testimony by defendant's officer at Fairfield is that the extent of common customer exposure is of the order of 7%. This is on the basis of identifying names from among defendant's customers who are believed to be users of ceramic insulators. Even this analysis is not too helpful since it gives no clue about volume. The 7% refers to the number of customers, not to activity.

All witnesses asked about the subject generally agreed that there are some companies who make or offer ceramic insulators and wire or cable as well, both high and low voltage. It also appears that smaller enterprises typically deal in either one or another of these three classes of electrical components, and that wholesale distributors generally handle all three, as do manufacturers representatives.

The area of actual or potential conflict is difficult to define because the products on both sides are rather basic electrical components that can be and no doubt are often used together in a wide variety of more complex electrical assemblies. By way of illustration the court asked whether the relationship were somewhat like that which would exist if plaintiff made Lapp ceramic for automobile spark plugs and defendant sold Lapp ignition cable, see Tr. p. 78, line 22 to p. 80, line 12. Such a use of the ceramic is essentially that of the "entrance bushing" mentioned earlier.

On the evidence as a whole, the present relationship does not seem quite that close, and a more accurate analogy would be to a Lapp spark plug on the one hand and a Lapp cable harness for wiring the headlights and tail lights of a car.

The problem presented, then, is a combination or hybrid of the problems dealt with in *Holiday Inns of America v. B & B Corporation*, 409 F.2d 614 (CA 3, 1969) and *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (CA 3, 1978).

■ As with *Holiday Inn*, the name is the same, but the risk of competitive engagement is presently low though the po-

tential exists. In *Scott,* both sides were using the same proper name, each generated independently of the other, one dating from 1879 and the other from 1925. Here, they date from 1916 and about 1957. In *Holiday Inn,* the activity was the same: both were hotels/motels. In *Scott,* one product was a line of paper, the other a furniture polish. Here, one side makes insulators and related hardware, the other makes insulated wire and cable. In *Scott,* the furniture polish maker applied for a U.S. trademark which came to the attention of the paper company, which asked for a 30-day extension of time to investigate a possible conflict, and then decided not to oppose the new registration, see 589 F.2d at 1227–1228. Here, the newcomer has not attempted any U.S. registration, and the plaintiff brought suit promptly after learning of defendant's existence and of customer confusion, and after a reasonable period to attempt to find an amicable solution. Thus, there are similarities and differences.

The complaint is in three counts, and while it does not identify specific statute sections it is evident that the first count claims direct infringement of the registered mark, under § 32 of the Lanham Act, 15 U.S.C. § 1114; the second count alleges false designation of origin under § 43 of the Lanham Act, 15 U.S.C. § 1125 and under New Jersey law; and the third count alleges infringement of common law trademark rights under New Jersey law. For a recent discussion of some of the differences, see *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

The critical date here is probably 1977 at the earliest, when defendant probably got started up in Fairfield, or early 1979 at the latest, when Rensselaer Polytech of Troy, N.Y. wrote to defendant in Fairfield for some replacement insulators for its high voltage tower, see Exh. B to the complaint.

Although plaintiff had undoubtedly established secondary meaning for its insulators and pole line hardware, capacitors, and the like, by that time, the court cannot say that it had established secondary meaning

for electrical conductors such as wire and cables.

In *Scott* the court found that kind of shortfall crucial on the matter of injunctive relief probably because the two fields involved, paper products compared to furniture polish, were too wide apart, and perhaps in part because the paper Scott had considered a formal objection to the registration of the polish Scott's trademark and decided not to proceed.

This case is not quite the same, because despite the defendant's arguments about the differences between high and low voltage components, the fact is that insulators and wires or cables are used at all voltages. Whether carrying power or signals, wires must be insulated to maintain circuit integrity, whether the insulation be by ceramic devices like those of plaintiff or by plastic coatings like those of defendant.

It is also true that some manufacturers produce both insulators like plaintiff's and wire or cable like defendant's, and some make both high and low voltage components. Certainly, supply houses in electrical goods carry or handle all the types, and the channels of trade are much the same. There are variations in the trade journals each is using now, but major reference sources such as the Thomas Register carries both.

Thus, this case is closer to *Yale Electric Corp. v. Robertson,* 26 F.2d 972 (CA 2, 1928), where defendant was prevented from selling "Yale" flashlights, which plaintiff did not make, because the name "Yale" was so strongly associated with plaintiff's locks. The area dealt with there is sometimes referred to as the area of "probable expectancies", or a penumbra surrounding the present and established good will, as representing where that good will might reasonably be expected to expand. See *Jersey City Printing Co. v. Cassidy,* 63 N.J.Eq. 759, 53 A. 230 (Ch. 1912); *Wall v. Rolls-Royce of America, Inc.,* 4 F.2d 333 (CA 3, 1925); *Great Atlantic & Pacific Tea Co. v. A & P Trucking Co.,* 29 N.J. 455, 149 A.2d 595 (1959).

■ So far as defendant's conduct is concerned, the evidence is that it was entirely innocent and without intention to infringe upon the plaintiff or degrade its reputation. However, it was surely careless in relying on no more than an "available name" request from the Secretary of State of New Jersey. This provides no protection whatever as the corporation law expressly states, see N.J.S.A. 14A:2–2(5); *Caesars World, Inc. v. Caesars Palace*, 490 F.Supp. 818 (D.N.J.1980).

■ In any event, it seems that it has long been considered that while the absence of fraudulent intent may be a defense to an action for damages prospective relief is warranted without regard to the actual intent of the infringer because an intent to deceive, and to benefit from the trade reputation of another, is conclusively presumed from the use of the name or mark after request to desist. See, e.g., *Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co.*, 69 N.J.Eq. 159, at 167, 60 A. 561 (Ch.1905).

The line of Hilton decisions in New Jersey also illustrates the subject well because the original award of injunctive relief against the use of defendant's own surname was modified as somewhat too broad, and then affirmed. See, *Hilton v. Hilton*, 89 N.J.Eq. 149, 102 A. 16 (Ch.1917), mod. and aff'd., 89 N.J.Eq. 182, 104 A. 375 (E & A 1918). Thereafter, defendant was adjudged in contempt of the modified injunction not once, but twice, *Hilton v. Hilton*, 89 N.J.Eq. 417, 105 A. 65 (Ch.1918) and 89 N.J.Eq. 472, 479, 106 A. 139 (Ch.1919), and affirmed, 90 N.J.Eq. 564, 107 A. 263 (E & A 1919).

One of the opinions on the contempt aspect is noteworthy for the articulate expression for which Vice-Chancellor Lane was known:

"The rule, of course, is that the similitude must be sufficient to confuse an ordinarily prudent man, but the test as to the care or prudence is not the precautions which a reasonably prudent man would take when investing money, or what not, but the precautions he would take ordinarily in determining, in buying a suit of clothes, that he was in the store he thought he was in."

Another pertinent name case is that of *Charles S. Merton & Co. v. Percy Merton, Inc.*, 103 N.J.Eq. 380, 143 A. 515 (Ch.1928), in which defendant was permanently enjoined from continuing the use of "Merton" in its corporate name or in its manufacturing or selling, and that if defendant wished to do business under that name he was to accompany it with the words: "Not connected with Charles S. Merton & Co."

See, also, *Hat Corporation of America v. D.L. Davis Corp.*, 4 F.Supp. 613 (D.Conn.1933) involving the use of "Dobbs" on hats.

The history here is also influenced by the fact that defendant's principals originated and built up their wire and cable business in West Germany, according to European technical standards which differ from UL standards or specifications. Even though the "Lapp" name is the same, it is doubtful that there would have been any friction, collision or confusion until defendant was set up here and began advertising in U.S. technical publications, particularly in the Thomas Register.

The physical exhibits put in evidence by defendant show eloquently that it is offering products here for the U.S. market which U.I. Lapp KG probably did not when it was selling to American EOM's who made goods for export to Europe. A number of the items are made up of wire and other components that are not of Lapp's (Gmbh) manufacture at all. The test converter, Exh. D–14 has a 3-prong male plug marked "Leviton", and "Made in USA". The receptacle at the other end, which takes a European plug, carries several embossed marks but none is Lapp's. The connecting cable carries no name at all.

Similarly, the harness, Exh D–13, is made of wires with marks of someone other than Lapp, and bearing a UL designation. The same is true of the wires in the thick, extendible coil, Exh. D–12 the fittings on which also carry the designation

AMP of a US manufacturer. Lapp's name does not appear at all.

Thus, it is evident that having set foot here, the defendant is not merely trying to improve Stuttgart's export business, but is building up its own entirely U.S. business as a job shop producer or assembler, relying on the Lapp ads in the Thomas Register and elsewhere, but using components which no Lapp has made.

This opens the risk that plaintiff's reputation and good will built up over more than 60 years will be affected not only by what is done in Stuttgart but also by what is done in Fairfield with anyone's components.

The facts, and the direction in which they point, are clear. The shaping of relief is another matter. Some guidance is found in the *Holiday Inn* case, discussed above. It would be appropriate to draw an analogy that, as plaintiff there had not established a hotel in the Virgin Islands, relief was limited to a declaratory adjudication of priority, with injunctive relief to follow, if need be, at such time as it began business there.

A similar approach provides a fair balance here. Plaintiff has undoubted priority in the U.S., and as a newcomer defendant may need to modify its format for the U.S. market. The corporate name should probably be modified to remove "Lapp", since this key feature in common is what causes problems in indexes, registers, and the like. Yet, to continue some effective indication of its relation with Stuttgart, it might use the name "U.I.L. Cable, Inc.", and mark its home-made product with the cable symbol. In this way, the prominence of "Lapp" would be attenuated, yet defendant would not be deprived of its legitimate use without struggling with the more awkward approach of saying "Not connected with", or "Not the original", and so on. There is no need to repeat here the Roman experience of having three restaurants "Alfredo's", each claiming to be "the original", or the Philadelphia experiment with two "Bookbinder's".

The *Carl Zeiss* cases have not been overlooked but have been read with care. The major ones are the main District Court opinion on the trademark infringement aspect, 293 F.Supp. 892 (D.N.Y.1968), and the opinion on affirmance (modifying only on the damages aspect), 433 F.2d 686 (CA 2, 1970). The factual and historical background is unfortunately omitted from the first, but is informatively summarized in the second.

These cases are useful, despite their obvious differences from the present set of facts, because Carl Zeiss is a personal name, it had clearly achieved secondary meaning both at home and abroad, it was protected here by U.S. trademarks (which defendant does not have), and because of the earned reputation for high quality of specialized optical goods (e.g., binoculars, microscopes, cameras, surveyors instruments, etc.).

Another of the District Court opinions in the *Carl Zeiss* litigation, although directed to an analysis of an antitrust misuse defense, is also of interest here because of its discussion of the legislative history of the Lanham Act of 1946, and particularly of the statutory change made then to render a registration incontestible, i.e., conclusive evidence, subject only to the defenses or defects enumerated in 15 U.S.C. § 1115. See, 298 F.Supp. 1309 (D.N.Y.1969).

In the *Scott Paper* case, the Court of Appeals listed 10 factors to be considered in determining the existence of likelihood of confusion. See 589 F.2d at p. 1229. Much the same approach was taken in the *Carl Zeiss* case although the list is somewhat shorter and the expression varies but the concept is much the same.

Review of each of these components, which are an attempt to catalog the various elements that have been considered by courts in the myriad reported cases, provides no precision, no quantitative index or measure for aggregating to support one result or another. The result in the *Scott Paper* case shows this quite clearly.

The trial court there undertook an extensive review of the factors, 439 F.Supp. 1022

and made findings on them. The panel of the Court of Appeals was aware that these findings could only be disturbed if "clearly erroneous", in view of F.R.Civ.P. 52(a), but felt that inferences drawn from basic facts are subject to less restrictive review, and implied that the "clearly erroneous" standard does not strictly apply to findings of fact in cases decided primarily on documentary evidence, where the reviewing court is in an equally good position to evaluate the evidence, and that review in such situations is not as constrained as in cases where credibility of a witness may be in issue. See 589 F.2d at p. 1229, footnote 3.

Those comments in the *Scott Paper* case do not provide any guidance to trial judges dealing with other cases in the field, except, perhaps for the undoubtedly correct statement that: "Each case of trademark infringement must be evaluated on its own facts and circumstances." 589 F.2d at p. 1231.

Barring one point to be mentioned in a moment, the opinion in *Scott Paper* has all the marks of a trial de novo on the record compiled below, as though the trial judge had made no findings of fact and had drawn no inferences.

The process is thereby rendered essentially subjective and ad hoc, turning away to that extent from the usual effort (imperfect though it be) to achieve more and more of objective tests, more and more predictability of result, and the other like features of a system of law.

The subject also involves the usual debate about differences in review of decisions by fact finders depending on whether the fact finder is a jury or a judge, and about whether reviewing courts have original jurisdiction. See the discussion in *McNeil v. McDonough*, 515 F.Supp. 113, at 127–129 (D.N.J.1980).

Both the *Holiday Inn* and the *Scott Paper* cases are out of character with the general trend, in this broad class of cases, to insist upon adherence to high levels of business ethics, to press for raising those levels, and putting it to the newcomer or infringer to show justification. Neither

one mentions this factor, not even the list of 10 factors in *Scott Paper*, yet many of the earlier cases referred to, both State and Federal, place a significant emphasis on it, as a court of conscience would be expected to by long-established standards.

This is not to suggest that either the *Holiday Inn* or the *Scott Paper* case produced an unjust result. An outsider who can view only the published opinions and not the trial record, cannot have any opinion at all on that point. It does mean that, putting the question aside, the articulation of reasons is of that kind which does not provide a path or a beacon to the next who enters the thicket.

Thus, for example, both the cases would have been entirely consistent with the primary approach to these cases if the small Holiday Inn had been enjoined with reasonable terms to make the change, and if Scott's Liquid Gold had had its rights limited to its furniture polish (for the time being) with the requirement to make its style for the use of the name "Scott" as different as possible from plaintiff's.

The facts are well enough known to be subject to judicial notice: Holiday Inn did open a facility in St. Thomas, but it chose to present it as "Frenchman's Reef". The defendant Holiday Inn still exists in downtown St. Thomas. In the case of Scott, current TV ads include one of an air freshener device, a spray can mounted inside a wall mount, made by Scott's Liquid Gold. This is an expansion by the defendant in that case to a product as far from furniture polish as the latter is from paper goods, and that Lee Scott, no doubt gone from the scene, never thought of.

The point reserved for mention here is that in *Scott Paper*, where the products were not the same though the names were, the Court of Appeals ruled that the prior user relying on secondary meaning must show, by a preponderance, that it had established secondary meaning in the market for *defendant's* goods at some time *before* defendant "began using its mark". See 589 F2d at 1231–1232.

Since both sides were using surnames, one would expect that the rule would be that plaintiff would need to establish a secondary meaning at a time before the defendant established such a meaning; but the opinion clearly does not say that.

This court is inevitably bound by the law laid down by the Court of Appeals in this circuit, and by the Supreme Court of the United States, no matter what its own views and analysis of the law may be. In this case, since the plaintiff has never marketed wire or cable of any kind under the name "Lapp" (and this puts to the side the short lengths of insulated conductors of entrance bushings), there obviously cannot be any evidence of secondary meaning in the market for wires and cables, no matter how rational it may seem to sophisticated customers that the manufacturer of Lapp ceramic insulators and pole hardware and electrical capacitors should expand into wire and cable. Since defendant has *used* the name "Lapp" for wire and cable, the rule of law laid down in the *Scott Paper* case precludes the award of any injunctive relief.

Despite the court's view that, aside from the rule of *Scott Paper*, the circumstances would call for some form of declaratory relief, a limited injunction, and perhaps a reservation of jurisdiction to be invoked for further relief at the foot of the decree as the future unfolds, it is of the view that the rule of law just referred to bars that result.

Submit order dismissing the complaint, without allowance of costs.