**NATURAL FOOTWEAR LIMITED,**
**Plaintiff,**

v.

**Hart SCHAFFNER & Marx and Roots,**
**Inc., Defendants,**

and

**ROOTS, INC., Counterclaimant,**

v.

**Don GREEN, Michael Budman, and**
**Natural Footwear Limited,**
**Counterclaim Defendants.**

Civ. No. 79–2966.

United States District Court,
D. New Jersey.

Dec. 8, 1983.

Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Arnold B. Calmann, and Brian J. McMahon, Newark, N.J., for plaintiff and counterclaim defendants; Baker & McKenzie by Horst Werder and Leslie Bertagnolli, Chicago, Ill., of counsel.

Stryker, Tams & Dill by William J. Heller, Newark, N.J., for defendants and counterclaimant; Pattishall, McAuliffe & Hofstetter by Thomas Hofstetter and Patricia Smart, Chicago, Ill., of counsel.

## OPINION

BIUNNO, Senior District Judge.

This lawsuit involves the respective rights of Natural Footwear, Ltd., a Canadian corporation and Don Green and Michael Budman (collectively, "Natural") on the one hand, and Hart, Schaffner & Marx and Roots, Inc., (collectively, "Roots") to the use of the tradename and mark "Roots" in respect to the business of selling shoes, and other articles of apparel and as applied to the goods themselves.

Roots began operations in Jersey City in 1917 as a retail store founded by Adolph Root, selling articles of apparel and some housewares (such as curtains) of various brands. Eventually the store located in Summit, N.J. and it was there, in about 1950, that the founder's son, Perry Root, undertook a program to enhance the name by obtaining and selling what is called "private label" goods of a style and quality referred to as aimed at the "upscale market".

Private label goods are goods manufactured by others according to the style, materials, colors and other features selected by the merchant and with the merchant's label, sometimes alone and sometimes together with the manufacturer's label.

Perry Root also undertook to establish the name and reputation of the business and its goods beyond the geographic area directly served by the store through two major modes. One was an advertising campaign consisting of mail order ads in the New Yorker magazine, which has a national circulation, and the other by the building up of a list of customers both within and without the State of New Jersey, to whom seasonal brochures or catalogs were regularly mailed.

By 1965, his effort had achieved sufficient success to make the business an attractive one for acquisition, and in that year the assets, goodwill and the exclusive use of the name were sold to Hart Schaffner & Marx which placed its acquisition into a wholly-owned subsidiary, Roots, Inc., a New Jersey corporation. Since then the business has prospered, and sales have increased, under the management of Perry Root who has continued as president of Roots, Inc., and has opened a number of additional stores in New Jersey. There are plans for another Roots store to be opened in Boston, where Roots labeled merchandise has been sold on several occasions through the well-known Filene's store there. The name "Roots" has never been registered as a trademark under the Lanham Act although interstate sales have been made with the name Roots, both as a service mark and as the mark of the goods themselves, for a long period of time.

Whatever rights Roots has, then, are of common law origin as part of a tradename and as a trademark for its labelled goods.

Natural was begun in Toronto, Canada by Don Green and Michael Budman, both originally from Detroit, in about 1973. The historical account given is that while the pair were searching for a business to go into, they saw a pair of "earth shoes" that a friend had purchased at a store in Ann Arbor, and saw in that shoe a possible business opportunity. The earth shoe is described as one designed around a sole in which the heel of the foot is substantially

below the level of the sole, an arrangement thought to provide a more natural mode for walking since the sole could not bend and was rocked, while walking, from heel to toe. It is said that the sole was the subject of a patent issued to an inventor in Denmark, but aside from oral testimony of the witnesses on the subject, and some printed articles in the newspapers or in advertising matter, no formal evidence of the patent was introduced. The basic design is called a "negative heel" shoe.

In any event, Don and Michael decided to try out the earth shoe. On their next visit to Detroit, they drove to Ann Arbor and each bought a pair at the store there (which sold only the earth shoe). They liked the shoe and felt it could be profitably sold in Canada, and so attempted to locate a representative of the manufacturer. They found a Mr. Jacobs, a distributor in New York, who was the U.S. representative and, together with Don Green's father, who evidently had extensive business experience as a manufacturer in the auto parts business, they went to New York and met Jacobs.

When they explained to him their interest in making arrangements for a Canadian franchise to market the earth shoe in Canada, he is said to have supported the idea but to have explained that it would not be commercially feasible to do so because of the added expense of customs duties to import the shoe to Canada. He suggested that if they were interested, they would do better to find a manufacturer in Canada to produce the shoe for them. This was in about August of 1972.

They left in an enthusiastic and high-spirited mood, and began searching for shoe manufacturers and a retail store location. They had also been interested in marketing a brand of ice cream and a brand of yogurt, and had made one phone call to the ice cream company but never approached the yogurt company, although neither brand was then marketed in Canada.

Between August and November, 1972 they visited at least 10 shoe manufacturers in the Toronto area after discovering (from yellow pages listings) that it was a shoe manufacturing center, although neither had any technical background at all in the shoe manufacturing business.

In November, 1972, Don, Michael and Don's father again visited Jacobs in New York, and were extremely disappointed. Jacobs' attitude seemed to have changed greatly, and he was very vague. He said he had just opened an earth shoe factory in Massachusetts, and when they said they would like to see it, he replied that he did not want them to visit it. He had just set it up and did not want any visitors at that time.

Having put months of energy into the effort, Don and Michael felt Jacobs was misleading them and was not interested in their opening a Toronto store, or manufacturing the shoe in Canada. He had changed completely from being very positive to very negative.

So, instead of seeking a Canadian franchise from Jacobs, they discussed making improvements to the earth shoe and making their own product. The literature for the earth shoe they had bought had a "patent pending" indication. Don's father said he would have his Detroit lawyer look into the patent, and as a consequence they learned that a Danish woman, Anna Kalso had a patent (in the U.S. only) on the sole of the shoe, specifically on the items of the arch support and the slope of the heel. How the patent aspect was resolved does not appear. It may have expired. If it did, this would explain the opening of the Jacobs factory and his changed attitude.

In late November, 1972, Don and Michael met the Kowalewski family in Toronto as the BOA Shoe Company, the first name they found in the yellow pages. Mr. Kowalewski had emigrated from Poland to Argentina, and after some years there emigrated to Canada where they settled in Toronto.

Mr. Kowalewski was a highly skilled shoemaker specializing in custom made shoes for customers with foot problems who needed shoes that would fit them prop-

erly. Their work was very customized and very little, mostly special orders, was sold to retail outlets. The business was successful but small, and in an effort to enter the mass production market and compete with existing factories, it lacked the facilities and manpower and got into debt. An ad was placed in a Toronto paper to sell the business or find a partner who could provide financial backing, and about this time (though not in response to the ad) Don and Michael showed up looking for someone able to make an improved and modified earth shoe with a negative heel.

They had worn their earth shoes for some months and found them severe and uncomfortable. The heel slope was severe and the arch support hit the foot in the wrong place.

Don and Michael showed Kowalewski the earth shoes they had and asked if he could make them. He said he could although the design and workmanship could be improved. Some elements for improvement came from Don and Michael, others from Kowalewski. The difficulties and their solutions were as follows:

1. The difference in level between the sole and heel was too great for comfort; it was decided to lower the level of the sole.

2. The arch support embodied in the sole was too far forward and too near the ball of the foot to be comfortable; it was decided to move it back.

3. The earth shoe had no heel counter (the stiffened part of the upper that hold the back of the foot in place); it was decided to add heel counters.

4. The toe of the shoe upper was unsupported, leaving the toes subject to injury; it was decided to use a box toe.

To manufacture prototypes or samples, gum rubber soles of the new design were needed. A Toronto company could form the soles but needed a mold. Working with a model presumably made by Kowalewski, molds were made in Italy for a size 9 shoe (which both Don and Michael wore). The molding company made some soles and the Kowalewskis built them into shoes as prototypes.

Everyone was pleased with the results, feeling that the prototype modification was superior to the original earth shoe.

The first sample mold was made in June, 1973. Michael thinks he called Jacobs in New York to report their progress, but he was very discouraging.

Being satisfied with the redesigned sole, molds were ordered for the range of sizes from 5 through 12, hoping to have them finished by the end of July before the mold shops in Italy closed for the month of August. The deadline was met and the array of molds arrived in early August, 1973.

Meanwhile, the Kowalewskis were designing patterns for the uppers and making uppers, as well as 25 samples for the size 9 mold they had, in different samples, so that a number of people could try them out. They sent 6 pair of these size 9 samples to Don's brother, Richard, in Berkeley, California where he was a student at University of California to try out.

By the end of July, while awaiting the molds, the Kowalewskis had designed the uppers in all 8 sizes in 6 or 7 styles and were producing them. When the molds arrived the soles were pressed and the shoes finished. A typical sole in Exh. P–144A.

The first store opened in Toronto on August 15, 1973 with Don and Michael as the sales persons, and with an inventory of 125 pair in all sizes, with 6 or 7 styles.

Before that, in the earlier part of 1973, Don and Michael considered selection of a name and symbol for their product going into the market. Michael testified that in about March, 1973 while he and Don were driving to their cabin, Don mentioned that he had noticed the word "roots" in a biology or botany book of a girlfriend and thought it would be a good name to use. They had previously talked about "roots" in respect to family background, and the word had also been used on the jacket of a popular phonograph record. Michael said the selection did not come from Alex Ha-

ley's book, or the TV series, which were in 1975.

The name was given to Burns and Cooper, a graphic designer and illustrating firm in Toronto that specialized in trademarks, symbols and logos and discussed it. Burns prepared artwork for the name "Liberty Boots", but Don and Michael did not like the name or the symbol. They wanted "roots" and a symbol with a Canadian identity. A week or 10 days later, Burns had prepared a symbol and logo using "roots", plus a beaver in a semi-circle and "Natural Footwear" (evidently much like the design shown on the registration, Exh. B to the complaint).

A store location was found in Toronto with a semi-circle facade that the design would fit and this was the place they picked, taking possession about April 1, 1973.

They then consulted the Canadian lawyer, Mr. Marvin Cohen, who had formed the Don-Michael partnership (later renamed Brian-Joel) for advice on securing trademark protection. He in turn referred them to a patent and trademark lawyer in Canada, Mr. Iver Hughes in April, 1973. Don's father suggested they look into securing name protection in the U.S. in case they ever decided to do business there. Mr. Hughes briefly described the procedure and said he would need to make some type of search in Canada and the U.S. to see if it had been trademarked.

In early June, 1973, Hughes notified them that they would be able to use "roots" and the symbol in both Canada and the U.S., and the registration was thereafter accomplished in about mid-1973 in Canada, and within two months after that, in the United States. The search documents are not in the record, though sought.

[Michael Budman's recollection is not quite the same as is shown on the U.S. registrations. No. 995,891 recites a Canadian application for "ROOTS" filed May 14, 1973, and the U.S. application August 13, 1973. The design and symbol, No. 1,008,-601, recites a Canadian application filed July 5, 1973 and the U.S. Application August 22, 1973].

The Toronto store was prepared and furnished in mostly natural materials, such as oiled natural oak and natural cedar (with no stain). It opened on August 15, 1973. Don and Michael staffed it for two or three weeks, with a helper on weekends, and then hired their first store employee. The demand proved to be "phenomenal" and it became necessary to plan more production and make new arrangements with the Kowalewskis.

Initially, Don and Michael bought all the materials (soles, lasts, leather, patterns, and so on) except small items (glue, laces, thread and eyelets), while the Kowalewskis provided the labor on a piecework basis. Around the end of September, 1973 arrangements were made to buy all assets of BOA Shoe Co. from the Kowalewskis for $20,000, to get larger facilities and more machinery, and worked out an employment arrangement to pay the Kowalewskis a salary plus a bonus based on the excess over the first 12 months' estimated production of 25,000 pair. The new location opened in October, and actual production in the first 12 months ended up at 125,000 pair. At one point, they reached 400 to 500 pair a day. The factory continued at its new location until May of 1974 when they again outgrew it.

A second Canadian retail store was opened in Montreal in December, 1973. The first shipment of production shoes into the U.S. was December 14, 1973 to Don's brother Richard, in Berkeley, Cal. His store opened in the period between Christmas, 1973 and early January, 1974.

Without setting down the extensive detail adduced at the final 12 days of trial, the record shows that Natural undertook to market its own modified negative heel shoe in Canada and the United States through two major modes: one was through so called "company stores", which were owned 50% each by Don and Michael, and the other was through "franchise" stores. In both cases, the only goods sold were the shoes made by Natural in Canada, along

with small quantities of "accessories" such as shoe polish, saddle soap, mink oil, belts, scarves, wallets, leather bags, and some T-shirts, socks and hosiery, all of which (except the leather goods) were made by others for Natural and carried the name and logo.

The testimony is that franchise stores paid no license fee or commission for the franchise but were committed to buy their inventory only from Natural and to sell no one else's goods. At some early stage in about late December, 1973 an intermediate wholesaler was formed in Detroit called Century Importers, owned 48% each by Don and Michael and 4% by Don's father. The purpose of Century was to simplify the task of clearing U.S. customs and paying import duty. The goods evidently were shipped by air to a single airport, with each carton addressed to the consignee store, where Century would attend to the customs duty and services of a customs broker. The goods were invoiced to Century at one price and it, in turn, invoiced the U.S. retailers after a markup.

There is no clear measure of the pricing arrangements. Don Green testified that the factory cost for goods manufactured by Natural in its own factory was marked up 20% for sale to retailers, and goods made by others for Natural were marked up by it by 10%. See 11/2/79 Transcript page 130, line 21 to page 132, line 13, for example.

Exh. P–70, marked on 10/25/83 shows the "markup" reflected in the price to U.S. stores over the price charged by Natural to Century, for shoes, to range from a low of 10.16% ($3. out of $29.50) to a high of 22.97% ($4.25 out of $18.50).

Michael Budman's testimony in the afternoon of October 24, 1983 was that for an item that cost $10. to make in Toronto, the price to Century was $13. (or 23%). Customs duty would be 8% of the $13., or $1.04 and the broker's fee would be 10% or $1.30, for a total of $15.34 (Mr. Budman said $14.50), and Century would then sell to the retail outlet for $17.00, and the price to the customer would be $35 for this example, which indicates a 23% markup from factory to Century, about 9% from Century to retailer, and about 50% from retailer to customer.

The revised Exh. P–91A (marked 10/25/83) shows that the U.S. stores were opened more or less in time groups. Aside from the Berkeley store, opened in December, 1973 or January, 1974, 4 stores were opened in March, 1974, 3 in June, 1974, one in August, 1974, 3 in September, 1974 and one each in October and November, 1974. During 1975, 5 opened in January, one in February, 7 in March, one in May, 2 in June, 2 in July, 3 in August, 2 in September, 4 in October and 2 in November. During 1976, there were 11 stores opened from February to September. Only one store opened in each of 1977 and 1978.

Of these 54 U.S. stores (two of which may be location transfers), 22 had closed by about June of 1977 and 18 more had closed by August of 1979 (before the present complaint was filed). In all, 16 stores remained in operation and of these, 7 had changed name and no longer carried Natural's shoes exclusively.

Mr. Budman testified on the morning of October 25, 1983 that in 1977 Natural had a change of philosophy as the negative heel began to wane in popularity, and it developed new products because the stores could not survive if they were not successful. Many customers told them they liked the quality of the shoe but were not happy with the negative heel, so they revamped the styles.

Richard Kowalewski testified that the first shoe Natural made with a positive heel was in April, 1977 (Tr. p. 1.114 et seq.), and see, also, Exh. P–144. Negative heel shoes are still made today, but Natural makes more positive heel shoes than before, and the small number with negative heel go mostly to Europe (Tr. p. 1.153, 1.154). In recent years, as shown by actual shoes marked in evidence, the trend has been away from the molded gum rubber soles, used mostly for athletic shoes, boat shoes, hiking shoes and boots, and the like, to all-leather shoes of the traditional type

such as loafers, and a number of styles of the business shoe type.

Also, in early 1977, Mr. Budman testified that Natural explored selling shoes through established outlets. They met with a Saks buyer in New York and showed a line of 6 or 7 shoes or boots and obtained an order to start delivery in 1977, for tryout in 7 Saks stores. The shoes are shipped to a central warehouse in the New York City area, labelled for the particular stores, and Saks attends to the distribution from there. In this period, about 20 of the U.S. stores closed. Some were in secondary locations and lacked the finances to keep going when sales diminished. So Natural decided to concentrate on the factory level to develop new products and not devote time involved in operating company stores. The situation was not working for them and they saw their future with department stores where an order from one buyer would reach many retail outlets in the chain. The first ad by Saks in the N.Y. Times was in September, 1977 when Natural's shoes were put on sale there for the first time. The ad, Exh. P–119, uses the name "Roots".

When the September, 1977 Saks ad appeared, both Don and Michael were aware of Roots, Inc. and of the cancellation petition dated May 18, 1977 and filed June 2, 1977 with the U.S. Patent and Trademark Office (see Complaint, par. 10 and Exhibit C, the institution of which is admitted in the Answer and Counterclaim). At first, Mr. Budman testified at trial that he first learned of the cancellation petition in about August, 1977 from his Toronto attorney. Later on (in his cross-examination) he said he became aware of Roots, Inc. several months before the ad and spoke to Perry Root by phone in the Summer. Don Green testified at the preliminary injunction hearing that "we" became aware of Roots in the Spring of 1977 through the cancellation petition (11/1/79 Transcript, pages 69–71). Mr. Budman testified he never heard of Roots, Inc. before the 1977 cancellation petition. Mr. Green was asked if he had heard (before the 1977 phone call) of Perry Root's letter of June 20, 1975 to Mr. No-

vak, the manager of the New York store operated by Natural, and he said he had not (11/1/79 Transcript, p. 71). The answers to interrogatories report that Mr. Novak is no longer with Natural and his whereabouts are not known.

In any event Saks was not told about the trademark cancellation petition, and they continued to market shoes through that chain of stores.

The change of selling channels continued, and in 1978 Natural also began to sell shoes to Bloomingdale (N.Y.) and Nordstrom (California). There was no longer any need for Century Importing because Natural could ship directly to Saks' central warehouse at landed cost, and because of the closing of the stores that had been used in the U.S., they did not want the expense of an office and a corporation in Detroit.

Early in 1979, the Saks merchandise manager for men's clothing (including shoes) suggested that Natural consider bringing out a line of clothing for the Fall of 1979 to be tried out in New York, Chicago and Detroit. This was to include leather and suede jackets, pants, sweaters, blazers and accessories. Goods of this kind had not been sold anywhere by Natural before this.

Don and Michael returned to Toronto and by the end of March, 1979 had style prototypes ready, some made in their factory and some elsewhere, but to their patterns and materials. A Saks representative was sent to Toronto to see the samples, and he bought the line, placing an order for $50,-000 to $60,000 of merchandise. The goods were shipped in August, 1979 and the offering at the three stores was a success, accompanied by considerable publicity.

But in October, 1979 the issue of the U.S. trademark came up again. Their Toronto attorney, Mr. Hughes, said that the U.S. Attorney, Mr. Dominik, had reported revived activity and recommended a meeting with him, which was held in Toronto. At the meeting, Dominik reported that Don, Michael and Natural were faced with a lawsuit in New York and that he felt it was

serious. His view was that Natural should file suit first in New Jersey. Mr. Hughes concurred, and it was done. (See the Complaint, par. 12 and the Answer, par. 12).

After the preliminary injunction in December, 1979 (dealing with wearing apparel other than shoes) Natural took the clothing out of Saks and returned it to Toronto where it was sold through a Toronto boutique.

Although the preliminary injunction did not prevent Natural from selling apparel under any brand or mark other than "Roots", this was not done, and Saks never asked if they would market the same line under the Don-Michael label or some other label, although some clothing was shipped in to the U.S. under the Don-Michael label, but not to Saks. Saks did not lose enthusiasm after the injunction but was nervous about getting into litigation. The Fall, 1979 order for Spring, 1980 (Exh. P–78) was cancelled as a joint decision of Natural and Saks.

Since then, Natural has continued to develop the clothing line and as of final trial in 1983, the business is 60% shoes and 40% clothing, the clothing being sold mostly in Canada and Europe, with some in the U.S. under the Don-Michael name. As of the same time there were two Natural stores in Michigan, while the ones left in Seattle and San Francisco have changed their names.

From this detailed summary of a much lengthier account the pattern of Natural's history seems fairly clear. The enterprise began as an idea to manufacture a patented Danish shoe in Canada for sale there under some kind of franchise from or through Mr. Jacobs but those negotiations collapsed and a modified design of negative heel shoe was produced under the name "Roots", registered in both Canada and the United States.

The early success was exceptionally good. In the first full calendar year, 1974, shoe sales to the U.S. were $865. thousand, and in 1975 topped $3.7 million. After that sales declined, with fluctuations, at the following levels (rounded off):

| 1976 | $2.9 million |
| 1977 | 1.9 million |
| 1978 | 1.5 million |
| 1979 | 2.0 million |
| 1980 | 1.6 million |
| 1981 | 1.5 million |
| 1982 | 1.9 million |

The peak year, 1975, is the year of a major advertising campaign involving expenses of some $300,000 paid by Century Importing alone. It is also the year in which Haley's book and the TV series, "Roots" received massive national attention and the good fortune of that coincidence is mentioned in an article in December, 1977, quoting Mr. Budman to that effect, Exh. P–81.

Despite this, sales evidently were not enough to sustain the company store and franchise store network, and many stores closed in 1976. The evidence is that the attraction of the negative heel declined, and the heavy sales may have satisfied much of the demand, especially for the curious.

Changing to regular heel shoes and marketing through department stores, all of which began in 1977 was not enough to keep Natural's sales from declining by about one-third in 1977, and still more in 1978. There was a one-third increase from 1978 to 1979, then two more declining years, followed by a 25% or so rise from 1981 to 1982, which about matched 1977.

Not a great deal can be told from these figures because of a number of uncertainties. The figures are dollars, not units, and so how much reflects inflation over the term is unknown. The discontinued stores doubtless had some inventory, and there is some testimony by Mr. Budman that this was either sent back to Toronto or sold to a wholesaler in Florida who could match up broken sizes. There is no information about the volume involved either as units or in dollars.

The parties and witnesses quite obviously went to great lengths to try to bring greater precision to the details, but as the lengthy testimony and numerous exhibits

(some modified and updated during trial) show quite clearly, the manual bookkeeping system used simply did not record the kind of breakdown and detail that was sought to be gathered, and as Ms. Elizabeth Baer noted in her affidavit in early 1980, reconstructing that detail would be an enormous undertaking.

But it does not matter because the broad lines do appear and complete precision or accuracy is not essential for a fair understanding of the issues and for sound findings of fact.

In the case of Roots, Inc., a much older operation, the broad pattern is plainly discernable without the need for detailed breakdown and utter precision. The figures of significance begin with fiscal 1966 (there were only 3 months to fiscal 1965 after Hart Schaffner & Marx purchased Roots). Total sales that year were $1.7 million (rounded). By fiscal 1973 (just before major production by Natural) they had risen some 2.3 times to nearly $4. million. There have been increased sales in every year, and no decline, and by fiscal 1982 had reached $11.3 million which is nearly three times the 1973 level and nearly seven times the 1966 level. These are total figures, taken from Exh. CC–63 (marked 10/31/83).

The figures for footwear are equally instructive, starting in 1969 (the year Roots opened a separate shoe store) at the nominal level of $28,150., increased by fiscal 1982 to $548,489. This history shows declines along the way, as from 1973 to 1974 to 1975, from 1979 to 1980, with 1979 the highest volume in the series, but the overall increase is in two trends, one from 1969 to 1976, and then another rise from 1977 on.

In both cases, the magnitudes are small. Some perspective is obtained from the figures discussed in *Brown Shoe v. U.S.*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), especially at pages 297–304, 82 S.Ct. at 1508–1512, 8 L.Ed.2d at 519 to 523. They show for example that as of some 30 years ago, the G.R. Kinney Company, Inc. was the eighth largest company by dollar volume selling shoes in the U.S. Its annual retail sales were more than $42. million and it sold less than 2% of the total. This means that total U.S. retail sales of shoes were then more than $2. billion. Increasing population combined with inflation have doubtless increased that total since the middle 1950's. The figures for Brown Shoe (370 U.S. at 302–303, 82 S.Ct. at 1511, 8 L.Ed.2d at 522) for 1955 are that it then produced 25.6 million pairs of shoes or 4% of the Nation's total footwear production. This means that total production was of the order of 640 million pairs in that year, and population increases have no doubt made that total grow.

It is in this sense that both enterprises are small, even though they are surely very important to their respective owners and operators. The dispute, as well as the respective rights, duties and obligations involves only Natural and Roots. None but these two are known to be in the apparel business, including footwear, in the United States, according to the record of the case, using the name or mark "ROOTS".

After the witnesses had finished their testimony and exhibits had been marked, the court asked for views on the propriety of taking judicial notice of broad industry information, noting in particular the figures discussed in the *Brown Shoe* case, and some examples of tables published in the 1972 Statistical Abstract of the United States (see Tr. pages 12.18 to 12.32, Nov. 3, 1983). Natural felt that the *Brown Shoe* figures were both too old and discussed in the antitrust context of that case. So far as the Statistical Abstract data were concerned, Natural felt that the analytical basis was not relevant to this case and also could not comment on their accuracy. Roots, Inc. took the view that both references were proper sources of judicial notice under Fed.Ev.Rule 201 for providing some general context within which the specific figures of the opposing parties might be viewed.

This latter application was the only use the court indicated that this kind of general data might be helpful, making clear that it

had no idea at that point whether the data would be helpful, or to what extent.

These data have been studied by the court after deliberations, and in view of the lack of any information otherwise in the record, the court is persuaded that reference to them is proper for the very limited purpose of providing a perspective of the orders of magnitude involved in the activities of both sides. Some broad perspectives of this kind are clearly needed for several reasons. One is that both the expert witnesses who testified for Natural testified in terms of national markets, which implicates some understanding of what those markets are. The other is that the market structures indicate two branches of the apparel trade as well as an infinite variety of combinations of them.

*Brown Shoe*, for example, illustrates the rather dramatic changes in market channel structure for shoes in the immediate post-World War II era.

It notes that the largest U.S. producer, International Shoe, had no retail outlets in 1945 but by 1956 had acquired 130. General Shoe, then the 4th largest, had only 80 retail outlets in 1945 but grew to 526 by 1956. Brown Shoe, the third largest (if combined with Kinney) had no retail outlets before 1951, but by 1956 had acquired 845 (not including the 400 or so Kinney stores). See 370 U.S. 294, at pp. 300–303, 82 S.Ct. 1502, at pp. 1510–1511.

Footnote 1 of *Brown Shoe*, 370 U.S. at p. 297, 82 S.Ct. at p. 1508, briefly describes the "Wohl Plan" under which independently owned shoe stores agreed to concentrate on lines sold by Brown through Wohl, in exchange for credit and merchandising aid, in contrast to the Brown "Franchising Program", under which independently owned stores agreed not to carry competing lines of shoes in return for "certain aid" from Brown.

This kind of historical and descriptive data is useful in understanding the Natural retail channel structure before the first sale of shoes through Saks, because the record is scanty (no examples of retail store agreements are in the record) and

because from what evidence there is, both the "company stores" and the "franchise stores" were expected to carry only goods supplied by Natural (through Century), and the only difference between them was that the opportunity for profit and the risk of loss flowed to Don and Michael for "company stores" and to the independent owner for "franchise" stores. It is also clear from Michael Budman's review of the several versions of Exh. P–91, that "franchise" stores that sold goods from other sources than Natural were obliged to change their names to disassociate from Natural and Roots in the store name.

The data from the Statistical Abstract discloses more background because pertinent tables provide data for apparel as a whole, and also subdivided as men's and women's clothing (excluding shoes) and shoes as such. These data are informative because Natural's sales in the U.S. have been of shoes and not clothing, for all practical purposes, while Roots' sales are primarily for clothing and related goods, with shoes being a clearly smaller segment though not an insignificant one. The Statistical Abstract provides broad outlines for this kind of general perspective, with full recognition of the risks of placing too much confidence in tabular statistics. The fact remains that such data are widely recognized and relied upon for many much more important problem-solving decisions, that they are generally accepted sources of substantially undisputed accuracy (to the extent that such data can have some kind of accuracy), and are accordingly available for consideration in lieu of formal proofs. The difference is the usual one between admissibility and weight and the traditional caution is to use the data gingerly and for narrow purposes.

At the time of colloquy on the subject before summations, the court had for discussion some of the tables from the 1972 Statistical Abstract. Since then it has located more current data from the 1981 Statistical Abstract, and both are looked to for this broad perspective. Some population figures (to be discussed) were later

found in the 1982 World Almanac, citing census figures, and are looked to for the same narrow purposes.

The U.S. population in 1950, when Perry Root came to his father's store, was not quite 151. million. By 1970, five years after HS & M bought Roots and four years before Natural's first full year of production, it was slightly more than 203. million (a rise of 35% calculated on the specific figures). By 1980, it was 226.5 million (a 50% increase over 1950, and an 11.4% increase over 1970) see U.S. Population by Official Census, 1790 to 1980, 1982 World Almanac, pp. 198–199.

Except for the District of Columbia, New Jersey was the most densely populated State in 1970 (953. per sq. mile) and 1980 (979. per sq. mile), and in 1960 had been second (805.5 per sq. mile) only to Rhode Island (819.3 per sq. mile). Aggregate population of New Jersey went from 4.8 million in 1950 to 7.2 million in 1970 and 7.3 plus million in 1980. *Idem.*

Total Canadian population is not reported for the same years, but the levels and trends from the available data are instructive. It was 20. million in 1966, 23. million in 1976, and 24 million by way of estimate as of January, 1980. *Idem,* p. 507. It seems to run, over the pertinent period, at a level somewhat above 10%–11%, or so of the U.S. population, and it would be reasonable to expect that population size would be a major factor influencing market volume for wearing apparel, including shoes, along with other factors.

There are other census tables that are informative. Table 1205 (1972 Abstract, p. 722) shows that annual production of shoes and slippers has been remarkably stable, being 552. million pair in 1950 and nearly 559. million in 1971. Retail sales (dollars) of all footwear are given as $4.2 billion in 1963 and $5.3 billion in 1967 (1972 Abstract, Table 1239), $7.7 billion in 1972 and $10.6 billion in 1977 (1981 Abstract, Table 1473. p. 815).

No doubt the retail sales figures, in dollars, not only reflect shoes produced outside the U.S., but also price changes due to rising costs and inflation. Since the retail sales tables do not reflect unit volume (number of pairs) as do the production tables, no reliable conclusions can be grounded on either set of tables or both combined, other than to have a general indication of the size of the two enterprises in relation to the entire U.S. market.

Like observations apply to census data about apparel other than shoes. For 1963, men's and boys clothing (excluding footwear) was $7.3 billion and for 1967 $9.5 billion; while women's and girl's clothing (except footwear) was $14.4 billion in 1963 and $18.8 billion in 1967 (1972 Abstract, Table 1239, p. 742). For 1972, the figures for men and boys is $15. billion and for 1977 it is $22.7 billion. Women's and girls data are $26. billion in 1972 and $36.5 billion in 1977 (1982 Abstract, Table 1473, p. 815). Useful production figures do not appear since what is there is subdivided along different lines, and sometimes gathered on a selected basis, but without easily available totals.

Thus, while the data have some value, their proper use is quite narrow and in this sense Natural's objections are fully taken into account.

*Analysis of the pleadings.*

THE COMPLAINT asserts two grounds of jurisdiction: federal question (28 U.S.C. § 1338 is cited, presumably for Lanham Act claims, but 28 U.S.C. § 1331 is also implicated) and diversity of citizenship (28 U.S.C. § 1132 [sic], meaning § 1332).

Venue is laid in this district under 28 U.S.C. § 1391(b) and (c), with Roots, Inc. "residing" in this District and H S & M doing business here and so "residing" here. [NOTE: The allegation that "all the acts complained of" were committed in this District would be more accurately read to say that they were committed "from" this District, as the evidence shows interstate activity.]

"Facts common to all counts" are alleged to be:

... par. 6. Natural has the exclusive license to market products in the U.S.

under the name "ROOTS" under the two trademark registrations attached as Exh. A and B, by acquisition from Don Green and Michael Budman, once doing business as "Don-Michael". [NOTE: The court does not find any evidence in the record of a license from Don-Michael to Natural, other than oral testimony, and assumes there was such a license but without details of date and terms].

... par. 7. Natural has applied "ROOTS" to goods sold throughout the U.S. such as shoes, scarfs, pens, carrier bags, packaging bags, shoe polish, saddle soap, mink oil and men's clothing. [NOTE: The evidence also indicates some T-shirts, wallets, belts, sheepskin lined vests and the like. It also indicates the first significant sale of "men's clothing" to be the tryout line sold to Saks for the Fall of 1979].

... par. 8. Natural sold its "ROOTS" products in a list of States through licensees and distributors, with a business volume of more than $1. million for each of the five years 1975 through 1979 [NOTE: the evidence shows such volume over those years but only for shoes, with the other items far below].

... par. 9. ROOTS, INC. is owned by HS & M

... par. 10. ROOTS, INC. is a modest retail store chain located in and doing business "solely in" New Jersey and on June 2, 1977 lodged a cancellation proceeding (petition attached as Exh. C) to cancel the Don-Michael trademark registrations.

... par. 11. After acquiring ROOTS, INC., HS & M asserted ownership to the mark "ROOTS" for all goods HS & M made and sold from the time when ROOTS, INC. was first established [NOTE: The record contains no evidence to support this independently of the parent/subsidiary relation].

... par. 12. ROOTS, INC. and/or HS & M intended to sue one or more of Natural's "affiliates" in the United States, consciously to interfere with Natural's right to distribute its products in the U.S. [NOTE: What was said to be a draft complaint for filing in New York was shown to Perry Root but he had never seen it and it was never authenticated or received in evidence. The ROOTS answer does say that it was prepared to bring such a suit and so informed Natural, if agreement to resolve the controversy could not be reached, that it refrained from filing during settlement discussions, but that while awaiting Natural's response, the present suit was filed. The only specific evidence on this aspect was Mr. Budman's testimony about the Toronto meeting where Mr. Dominik recommended that suit be filed here and Mr. Hughes concurred, mentioned in the history above].

... par. 13. Alleges the existence of a case or controversy for the court to resolve.

There then follow three separate counts:

COUNT I After repeating the earlier paragraphs, says that the court is authorized by 15 U.S.C. § 1119 to decide whether the Don-Michael registrations for "ROOTS" should be cancelled, and asks that the rights be determined. Judgment sought on this count is a permanent injunction from pursuing the trademark cancellation proceeding and requiring withdrawal of the petition for cancellation (Exh. C).

COUNT II After repeating the preceding allegations, says that ROOTS, INC. is violating 15 U.S.C. § 1125(a) by sales in and to territory where Natural has established its rights, in that Natural's goods are recognized as high quality Canadian goods and in that purchasers of ROOTS, INC. goods are misdirected as to "source of origin" [sic]. The demand is for a permanent injunction against use of the mark "ROOTS", or any variants, in connection with "the sale of merchandise through retail stores

located anywhere except in the State of New Jersey."

COUNT III After repeating the preceding allegations, it asserts that ROOTS, INC. is infringing Natural's exclusive license rights in marketing merchandise marked "ROOTS" or other term confusingly similar thereto. The demand is for a permanent injunction, plus damages. [NOTE: This count was described in summation as the "common law trademark infringement count", see 11/3/83 Tr., p. 12.-100 lines 18–19].

Both HS & M and Roots are named defendants. Although Counts II and III allege conduct only by Roots on the § 1125(a) claim and the common law claim (except for the general embodiment of all earlier allegations), judgment is asked against both.

THE ANSWER is by both HS & M and Roots, and denies the major elements of Natural's claimed rights. It also sets up the affirmative defense of laches.

THE COUNTERCLAIM is by Roots, alone. It is in two counts.

COUNT I asserts an unfair competition claim, with jurisdiction under 28 U.S.C. § 1338 and diversity under § 1332(a). It alleges senior use by Roots for its goods, services and business in the sale of men's and women's wearing apparel, including footwear, in many parts of the United States and in foreign countries, with extensive advertising and promotion in the "New Yorker" and "Wall Street Journal", by nationally circulated catalogs and by mail order sales throughout the United States.

It charges Green and Budman with registering the name and design, "Roots" in the U.S. Patent and Trademark office and alleges the filing of Roots' cancellation petition.

It charges Natural, Green and Budman with using "Roots" for shoes, and with beginning to sell a line of men's wearing apparel under the mark "Roots" through Saks retail stores in New York and other States, with full knowledge of Roots' prior use, without Roots' consent or permission

and notwithstanding the pending cancellation proceeding.

It alleges that Natural's use of "Roots" is likely to cause confusion, mistake or deception on the part of purchasers.

It charges that Natural's conduct is a false representation and designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

It charges that Natural's conduct is unfair competition under the common law and in violation of Roots' prior rights in the tradename in violation of § 44(g) and (i) of the Lanham Act, 15 U.S.C. § 1126.

It charges irreparable injury unless Natural is enjoined, and the lack of adequate remedy at law.

COUNT II Repeats the earlier allegations and charges that Natural's conduct constitutes trademark infringement under the common law (paralleling Count III of the Complaint) and under N.J. trademark statutes N.J.S.A. 56:3–13.1, et seq. (a 1966 revision amended in 1971), and of other States [NOTE: The record does not indicate registration by any party in this case under any State trademark statute, so only the common law aspect is in the case].

The demands for judgment, which follow both counts of the counterclaim, are as follows:

1. Preliminary and permanent injunction from using ROOTS, or any colorable imitation, in connection with the offering for sale of wearing apparel, including footwear, and related goods.

2. Damages (jointly and severally) sustained by Roots as a result of unfair competition and trademark infringement.

3. Accounting for profits in the U.S. by reason of the unfair competition and trademark infringement complained of.

4. Costs, and reasonable attorneys fees.

5. Delivery up to Roots for destruction of all infringing labels, packages, wrappings, advertising and the like, and the plates, molds, matrices and other means for making them.

6. Order to the Commissioner of Patents and Trademarks to cancel Natural's

**556**

registrations, pursuant to 15 U.S.C. § 1119.

THE REPLY TO THE COUNTER-CLAIM asserts that Roots abandoned any trademark significance to the mark "Roots" in favor of a stylized mark consisting of a "mirror image 'R'" [Perry Root described it as a "double R"; the court called it a "butterfly R"].

It denies that any sales by Roots amount to sales in "interstate commerce", particularly those marked with "Roots".

It admits only that Roots, with its "new" mirror image R operates a limited number of retail stores in New Jersey with merchandise selections intended for a limited market of wealthy, up-scaled demographic clientele, whose purchases are miniscule for achieving trademark use and even in New Jersey, within a limited part of the State.

It admits limited ads featuring the stylized mirror image R in local advertising media, and otherwise denies the advertising and promotion allegations.

It "admits" that Natural has extensively used "Roots" for wearing apparel throughout the U.S., and was unaware of any activity of Roots until May, 1977.

It "admits" that Natural's line of wearing apparel was extended progressively and was then (November, 1979) featured in exclusive stores throughout the U.S. including Saks, and the Roots (Natural) stores.

At a magistrate's hearing of January 11, 1982, the damage claims were abandoned (but not the accounting claims) and on February 11, 1982 a consent order was filed abandoning the damage claims and setting a non-jury trial. See, also, the colloquy of May 3, 1982 at Tr. page 2, line 9 to page 4, line 12.

At the same hearing trial on the merits was advanced and consolidated with the preliminary injunction hearing (Tr. page 4, line 13 to page 7, line 4), and a formal order to that effect was filed May 6, 1982.

Examined in the light of the final evidential record, the issues raised by the formal pleadings are more easily summarized.

Don Green testified, after having read to him Natural's prayer for an injunction to restrain Roots from using the mark "Roots" in connection with the sale of merchandise "through retail stores located anywhere except in the State of New Jersey", that he felt Natural had put 6 years of hard work into creating a very heavy impact in many American States, that people's awareness of the Roots concept was very strong; "we are willing to—in New Jersey we look at it as a different situation. Across America we feel we own the trademark Roots." (11/2/79 Tr., p. 122, line 25 to p. 124, line 20).

Toward the end of the day's testimony on October 25, 1983, Michael Budman testified about the 1979 conference at which it was decided to sue first and in New Jersey. He was asked if the purpose was to prevent Roots from shipping goods under the "Roots" mark to customers around the United States, and said they sued because they did not want Roots to open stores outside New Jersey, but did not remember anything about shipping to customers outside New Jersey.

He said he had seen Natural's complaint, and that what he wanted was not to allow Roots to open stores outside New Jersey.

He was shown paragraph 19, from Count III of the Complaint and the demand for judgment, and said it was to stop Roots from using the name outside New Jersey. He was not sure if he wanted also to prevent the mailing of catalogs to out-of-N.J. customers, with the name Roots. He did not object to the use of the catalog interstate where a New Jersey customer moved to another State. He did not know how a customer would know of a Roots product if the customer never lived in New Jersey.

From these two segments, in the context of the evidence taken as a whole, it is plain that Natural does not seriously advance a claim that it may prevent Roots from doing what it had done before Natural was born, namely to use the word "Roots" as a corporate name, a business name (or service mark) and as a trademark for the goods

sold by it and so marked, at retail stores in New Jersey to New Jersey customers, and interstate to customers ordering by mail or phone or interstate to out-of-state customers coming to a New Jersey store to buy either because they formerly lived in New Jersey or because of interstate advertising, including the mailed catalogs and brochures. The activity Natural wished to prevent was the opening of any Roots store outside New Jersey.

This considerably narrows the issues, since Roots is shown by undenied and highly credible evidence to have been making interstate sales of both clothing and shoes, and of "accessories", for a good number of years, in increasing amounts and by various modes, before Natural was born.

The issue is not whether Roots is free to do business interstate under the name and mark, but only whether it may do so through new retail stores located outside of New Jersey (but leaving unanswered whether the restriction sought is limited to Roots' own stores, or whether it includes sales through out-of-N.J. stores of others, such as Filene's in Boston, a pre-existing activity).

It is not clear whether Natural claims the right to sell shoes, or other wearing apparel, or both (along with accessories) under the mark "Roots" within New Jersey.

There also appears to be no real dispute that the marks are distinctive or unique, not merely a surname, and are identical and the risk of confusion, deception or mistake high. See testimony of Don Green, 11/2/79, page 119, line 2 to page 127, line 18.

*Non-final rulings.*

There have been two major rulings in the case so far, neither of which is final.

The first ruling, dated December 4, 1979, concluded that Roots was entitled to a preliminary injunction on the counterclaim. An injunctive order was then entered applicable to all the goods in dispute except shoes, in the United States. Shoes were not dealt with at all, as the ruling makes explicit, because the Don-Michael registrations in the U.S. were limited to footwear, and were the subject of a petition for cancellation filed in early June, 1977 and was pending before the Trademark Trial and Appeals Board.

The preliminary injunction was appealed, and a motion panel granted a motion by Natural to limit the scope of the injunction pending appeal by confining it to New Jersey and New York.

After submission on the appeal itself, the merits panel affirmed the order for preliminary injunction by judgment order in lieu of mandate issued April 14, 1980 and vacated the territorial restriction imposed by the motion panel pending appeal. The affirmance is noted at 620 F.2d 289 (CA–3, 1980), but no opinion was published.

[NOTE: As recorded in the record history above, Natural removed the only clothing shipment of substance, which had been to Saks and one Michigan store, to Toronto, and made no attempt pending appeal to sell such clothing under the "Roots" label anywhere outside New Jersey and New York, or under some different label anywhere except for small sales in Michigan under the Don-Michael label].

The second ruling was dated August 18, 1983 and dealt with Count I of the Natural complaint (seeking declaratory rulings in respect to the two Don-Michael U.S. trademark registrations and an injunction to forbid Roots from further prosecuting its 1977 petition for their cancellation), and with demand 6 on Roots' counterclaim (seeking a determination that the two Don-Michael trademark registrations were invalid and ordering the Commissioner to cancel them under 15 U.S.C. § 1119). Cross-motions for partial summary judgment on the conflicting sides of the same issue were the means to bring this aspect before the court.

The court tended to demur from this approach, having pressed for completion of trial since the early part of 1982, when it formally ordered trial on the merits advanced and consolidated with the preliminary injunction hearing (which was much

more extensive than most are) under F.R. Civ.P. 65(a)(2).

It was also concerned that the effort might well be wasted, and eventual trial further delayed, because the rule of decision on summary judgment motions in this Circuit is quite strict. See, *Meyer v. Riegel Products*, 720 F.2d 303 (CA-3, 1983).

However, both sides insisted that the issue was suitable for determination on cross-motions, that pendency of the cancellation petition before the PTO was no obstacle in view of 15 U.S.C. § 1119, that in fact nothing was going forward in that proceeding until this litigation was over, and that a partial summary judgment on the registration dispute, one way or the other, would advance trial preparation and completion.

The thorough briefs, and the argument, focused on the question whether Roots needed to establish "secondary meaning" to succeed on its claim that the registrations were barred by its senior use under 15 U.S.C. § 1052(d).

Natural's argument was that § 1052(d) did not bar registration unless Roots could establish "secondary meaning" for *footwear* throughout the United States, *before* Natural's Canadian filing date under treaty. Natural claimed that such a showing was essential, under *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (CA-3, 1978), and *N. Hess & Sons, Inc. v. Hess Apparel, Inc.*, 216 USPQ 721 (D-Md., 1982), among others, on the theory that "Roots" was the surname of the store's founder, and also of his son who now conducts the business for HS & M since the latter's 1965 acquisition.

Roots took the position that under 15 U.S.C. § 1052(d) there was no need to establish "secondary meaning"; it is sufficient, to bar registration, if "Roots" consists of a mark which so resembles a "mark" or a "trade name" previously used in the United States by another, and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

As the ruling of August 18, 1983 discloses, the court concluded that Roots' position was correct and that its use of the word as part of its corporate name, as a merchant to identify its business in engaging in trade or commerce (even though originating as a surname) was sufficient by itself to bar Natural's registrations under 15 U.S.C. § 1052(d), without regard to secondary meaning. See 577 F.Supp. 128 (D-NJ, 1983).

The order denied Natural's motion and granted Roots' motion on that issue, but since the order was not final and was subject to revision, see F.R.Civ.P. 54(d), and *Curtiss-Wright v. General Electric*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), the Commissioner was expressly not ordered to correct the Register by cancelling Natural's registrations at that time.

Had the law been seen as Natural argued, it would have been necessary to deny both motions for partial summary judgment because the trial record to that point contained extensive evidence of "secondary meaning" but no summary judgment could have been grounded on it since the evidential record was not closed.

Now that it is closed, and in light of the finding (discussed hereafter) that "ROOTS" had acquired "secondary meaning" throughout the United States, and in light of the clarification of this court's (mis)understanding of the *Scott Paper* case by the decision in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (CA-3, 1983), reversing 574 F.Supp. 1072 (D-N.J.1982) the outcome on the completed record is the same even on Natural's theory on the point.

The differences on the law are thus mooted out, and the final judgment will include a provision ordering the Commissioner to cancel the registrations.

*The Applicable Law*

At the outset, it is noted that the claims and counterclaims grounded on state law of unfair competition, tradenames and trademarks are here on two jurisdictional grounds. One is diversity jurisdiction, 28 U.S.C. § 1332, and the other is pendency to a federal claim, 28 U.S.C. § 1338(b). Juris-

diction under 15 U.S.C. § 1121 is without regard to amount in controversy or diversity.

■ Although the court ruled in August, 1983 that Natural's U.S. trademark registrations were barred by Roots' senior use under the Lanham Act, and that Roots was entitled to have them cancelled, that ruling was not then final and was subject to revision. The jurisdiction to deal with the conflicting claims centered on the registrations is original federal jurisdiction because the actions arise under an Act of Congress relating to trademarks, 28 U.S.C. § 1338(a), although that jurisdiction is not exclusive. See *O'Brien v. Westinghouse,* 293 F.2d 1 (CA–3, 1961).

The claims and counterclaims under state law are unfair competition claims pendent to the substantial and related claims under the federal trademark laws, 28 U.S.C. § 1338(b), and are also within the diversity jurisdiction, 28 U.S.C. § 1332.

■ So far as the diversity jurisdiction is concerned, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) controls on substantive law; the law of the forum state (New Jersey) is to be applied, and see 28 U.S.C. § 1652. Procedural matters, at least for aspects dealt with by federal procedural rules (or statutes) are governed by federal law under *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Thus, state law controls the substantive aspects of the common law on unfair competition (usually state equity law), whether it be here under § 1338(b), *Flexitized, Inc. v. Nat'l Flexitized Corp.,* 335 F.2d 774 (CA–2, 1964) (cert. den.), or because of diversity of citizenship, *Pecheur v. Nat'l Candy Co.,* 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103 (1942); from this circuit.

The first step in the process is to determine the forum state's "choice of law" rules. Again, this is the same whether the claim be pendent to a federal claim, *Systems Operations, Inc. v. Scientific Games, etc.,* 555 F.2d 1131 (CA–3, 1977) or based on diversity of citizenship, *Klaxon Corp. v.*

*Stentor Electric, etc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

At the outset of the last 12 days of trial, the court advanced the proposition that since the federal trademark statutes are an exercise of the Commerce Power rather than of the patent or copyright power, as was held in *The Trademark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879), 10/19/83 Tr. page 1.24, line 18 to page 1.29, line 25, state law must be consulted.

Considerable guidance is found in *Systems Operations,* supra, which was a product disparagement case which the Court of Appeals conceived would be treated in New Jersey much like a defamation claim, and, where multiple jurisdictions were involved, likely to treat the conduct complained of as a form of aggregate publication calling for application of the substantive law of the state where the person defamed is based or domiciled, and see, on this point, *Prager v. American Broadcasting Co., Inc.,* 569 F.Supp. 1229, at 1232–1233 (D–N.J., 1983), which also directs attention to N.J.Ev. Rule 9(3), last sentence, directing that in the absence of proof of the tenor of the law of another jurisdiction, the law of New Jersey is to be applied.

The evidence rule is not a rule of procedure. Both the New Jersey Legislature in enacting The Evidence Act, 1960, N.J.P.L. 1960, c. 52, N.J.S.A. 2A:84A–1, et seq., and the Congress in enacting the Federal Rules of Evidence, Pub.L. 93–595, 88 Stat.1926, took the position that evidence rules were substantive law not within the authority of the respective Supreme Courts to promulgate rules of practice and procedure. See the brief history and analysis in *Wearly v. F.T.C.,* 462 F.Supp. 589, at pp. 595–596 (D–N.J.1978).

In fact, the last sentence of N.J.Ev. Rule 9(3) largely derives from N.J.S.A. 2A:82–27, which was enacted as N.J.R.S. 2:98–28 (1941) and was the first section of the Uniform Act on Judicial Notice of Foreign Law.

The prospect of attempting to apply the unfair competition law of all the various

jurisdictions in which there are customers who have bought from Natural or Roots is the same as that discussed in *Systems Operations,* and the analysis of the Court of Appeals there on the question of what law New Jersey would apply is sound and applicable here.

No party attempted even to claim that the law of a jurisdiction other than New Jersey should be applied to the state law claim, much less to provide any basis for taking judicial notice of the law of sister states. The main New Jersey decisions on this subject are found in Comment 14 to N.J.Ev. Rule 9(3) in the *New Jersey Rules of Evidence,* 1983 Edition (Gann Law Books), pp. 87–88.

Finally, the court observes that the only federal trademark law involved is that connected with § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the so-called federal unfair competition law. Neither side made any claim of direct infringement of a registered mark under § 32 of the Lanham Act, 15 U.S.C. § 1114. Natural cannot because the two registrations it relies on are barred, and will now be ordered cancelled, and Roots cannot because it never did secure issuance of a federal registration. The distinction between the two provisions is discussed in *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

As noted in *The Trademark Cases,* supra,

"The right to adopt and use a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, to the exclusion of the use of that symbol by other persons, has long been recognized by the common law and the chancery courts of England and of this country, and by the statutes of some of the States. It is a property right, for which damages may be recovered in an action at law, and the violation of which will be enjoined by a court of equity, with compensation for past infringement. This property and the exclusive right to its use were not created by the Act of Congress and do not now depend upon

that Act for their enforcement. The whole system of trade-mark property and the civil remedies for its protection existed long anterior to the Act of Congress, and remain in full force since its passage." 100 U.S. at 92.

This concept underlies the position uniformly taken by all federal courts that have considered the question, that § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides protection against infringement and unfair competition, by transporting goods in interstate commerce, of common law trademarks and names, and that the senior user need not have a federal registration to have the remedies provided by this section. A recent decision discussing the point is *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, at 77–78 (CA–2, 1981). In this circuit there is found *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684 (D–Pa., 1978), aff'd 595 F.2d 1212 (CA–3, 1979). *Matador Motor Inns, Inc. v. Matador Motel, Inc.,* 376 F.Supp. 385 (D–N.J., 1974) is to the same effect. The decisions elsewhere are collected in the annotations to the section.

It has been observed before, by a leading scholar on "Conflict of Laws" that:

"We may postpone again, as we have before, the issue whether we may build up our controlling law from federal precedent or must look to state law and if so where. The parties are properly in federal court either by diversity of citizenship or by the provisions of the Lanham Act. *We have not been referred to nor have we found a split of authority between federal and state rules to compel us to make the choice just mentioned.*" (emphasis added; footnotes omitted) Opinion of Goodrich, J., in *Q-Tips v. Johnson & Johnson,* 206 F.2d 144 (CA–3, 1953), cert. den.

*Q-Tips* was a conflict of names or marks: Q-Tips and Cotton Tips. In *SK & F Co. v. Premo,* 625 F.2d 1055 (CA–3, 1980), there was a copying of trade dress of a pharmaceutical product (a red-white capsule). There Judge Gibbons separately analyzed the New Jersey and the federal law of

unfair competition, 625 F.2d at 1062–1066, and found that:

"The federal law of unfair competition is not significantly different, as it bears on this case, from that of New Jersey." 625 F.2d at p. 1065.

The court pointed out that while a competitor may freely copy an unpatented product, this federal law principle does not extend to affect the law protecting businesses in the use of trademarks, labels, and so on so as to prevent others from misleading purchasers as to the source of the goods by imitating the markings; referring to *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and especially at p. 232, 84 S.Ct. at p. 789.

Thus, for present purposes, the law of New Jersey and the federal law are substantially the same, and the court may look to New Jersey statutes and decisions as well as federal, with primary attention to decisions of the Supreme Court of the United States and of the U.S. Court of Appeals for the Third Circuit.

The applicable law for a "name" or "mark" case, where the subject involves competing goods or services, has most recently been articulated in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (CA–3, 1983).

In that case, as in *Scott Paper*, both sides were using the same name that had originated as a surname, and the junior user relied on *Scott Paper*. The trial court read *Scott Paper* as precluding relief to which the senior user would otherwise be entitled, but the Court of Appeals reversed.

The question had been whether the senior user, Lapp-Interpace, had been able to establish "secondary meaning" in the junior user's market. The trial court concluded that since Lapp-Interpace had never marketed wire or cable [the junior user's products] of any kind under the name "Lapp", there could not be any evidence of secondary meaning in the market for wire and cable.

In reversing, the Court of Appeals noted that in practice, likelihood of confusion and secondary meaning merge and that the evidence sufficient to show either, and the legal consequences flowing from a finding of either, are virtually indistinguishable, even though they are separate concepts in legal theory.

It was also observed that the approach to the likelihood of confusion issue is different in cases involving non-competing goods, as in *Scott Paper* (paper goods and furniture polish) than when there are competing goods or services. For non-competing goods, ten factors are to be considered. Where the case involves competing goods or services,

" * * * the court need rarely look beyond the mark itself." 721 F.2d at 462[1–3].

The inquiry is aimed precisely at the conduct which § 43(a) is designed to prevent, namely the use in commerce of a false designation of origin or of any false representation, including words or other symbols, tending falsely to describe or represent the same. The inquiry focuses, as does the bar of § 1052(d) on the likelihood to cause confusion, or mistake, or to deceive. As the court said in *Interpace*,

"Secondary meaning exists when consumers seeing a trademark assume that the product it labels comes from a particular source. If in fact the product did not come from that source, then there has been buyer confusion." 721 F.2d at 462[4].

Interpace resolves another point of law which was the subject of sharp and vigorous controversy throughout the litigation. Natural's position, as to shoes, was that since Roots derived from the surname of the founder, Adolph Root and his son Perry Root, it was essential that Roots prove not only that "Roots" had acquired secondary meaning but also that it had acquired it for shoes, and for the entire United States, *before* Natural made its first shipment of shoes with the label "Roots" to California in December, 1973.

On this point, the *Interpace* court said:

"Lapp, Inc. vigorously contends on appeal that 'Lapp', as a surname, is not entitled to trademark protection. Such was the law at one time, but as the district court noted, surnames have long been accorded full protection if they have become distinctive. 15 U.S.C. § 1052(f) (1976). *Scott Paper Co. v. Scotts Liquid Gold, Inc.*, 589 F.2d 1125, 1128 (3d Cir. 1978)" 721 F.2d at 463, footnote 1.

[NOTE: For the history of the "Delsartian" shoe, mentioned at trial, see *Medlar, etc. v. Delsarte, etc.*, 68 N.J.Eq. 706, 46 A. 1089 (E & A 1905)]

Finally, *Interpace* observes that where the names are identical (for competing goods and services) the names themselves are evidence of likelihood of confusion, citing *American Plan Corp. v. State Loan & Finance Corp.*, 365 F.2d 635, 639 (CA–3, 1966), cert. den. 385 U.S. 1011 [87 S.Ct. 719, 17 L.Ed.2d 548] (1967). See 721 F.2d at 463[6].

*Facts Not In Dispute*

While there is a massive record, both of testimony, documentary and physical exhibits, there is no substantial dispute about quite a few of the pertinent facts, and these are found in the list below since no extensive discussion of them is needed.

1. Roots began in about 1917, operated by Adolph Root, as a store for the retail sale of apparel and other goods, and has been in continuous operation ever since in a number of locations (with one branch being sold off along the way).

2. Perry Root joined his father's business in 1950 and was allowed to try his hand at building up the business. His object was to enlarge and enhance the custom and the Root name, and he went at this in a number of ways, including display methods, selection of merchandise, pressing for private Roots labelling, sometimes as the only label and other times along with the maker's label but in those cases with the Root name more prominent. He went out after mail order business and used regular ads for a number of years in The New Yorker magazine, which he regarded as the most suitable vehicle for reaching the type of patron he was seeking and whom he wished to serve by the merchandise he selected. Seasonal brochures or limited catalogs were also used, as well as "stuffers", these being mailed mainly to those who had patronized Roots or requested the mailing, although the press advertising of greatest frequency was in local papers. Ads also ran in regional editions of the Wall Street Journal and the Christian Science Monitor, as well as the Sunday, New Jersey edition of the New York Times (while formal testimony was not adduced, it is sufficiently known in this area that the New Jersey edition was begun about the same time the Newark Evening News went out of business in 1972 to warrant taking judicial notice of the approximate time, which is not critical).

3. He also introduced a Roots credit card (there had been customers with charge accounts before, but not on a credit card basis), and gradually compiled a list of names and addresses that could be used for mailings. The names of Roots charge customers were kept on a "Rolodex", a trademarked rotary device to simplify the handling of large numbers of small cards with information on them. The Rolodex was begun in 1965 and kept up to late 1973. Later on, general credit cards were also accepted.

4. In 1965, Roots was bought by HS & M. The purchase contract shows that it was a purchase of assets (accounts receivable, inventory, furniture and fixtures) as a going business, including the exclusive use of the name Roots. Roots, Inc. is the HS & M wholly owned subsidiary that acquired these assets (for a price above book value of assets) and has carried on business under the direction of Perry Root ever since, along the same lines he planned from the start.

5. The testimony, the ads, catalogs and like exhibits show that Roots carries and sells a full line of men's and women's wearing apparel (including shoes) and what might be called "haberdashery" or "accessories." It has achieved an exceptionally

high reputation as a merchant of goods of excellent quality, style and taste.

6. Some 80% of the merchandise sold by Roots carries the Roots label, mostly a woven label sewn on, and some 50% of all merchandise carries only the Roots label with no mention of the manufacturer.

7. From at least May of 1959, more than fourteen years before Natural first shipped shoes to California, Roots was offering its goods nationally by mail, as shown by the examples of The New Yorker ads, Exh. CC–38. Every ad solicits mail orders for such apparel as English cardigans, washable Bermuda shorts, terry beach tops, swim trunks, paisley wool vests, Loden coats, British worsted sweaters, formal shirts, slacks, India madras swim trunks, India madras shirts, business shirts, all-weather poplin coats, camelhair sweaters, shetland sweaters, sheepskin coats, woolen skirts and sweaters, English duffle coats, wool country trousers and sweater-shirts, and Harris Tweed sportcoats. Every one of these ads expressly solicits mail orders, and some offer a catalog on request.

8. The Rolodex cards with addresses of out-of-state active charge customers are reproduced as Exh CC–25 (with the names deleted) as at the start in 1965, updated to late 1973 when its use was discontinued and the contents were transferred to a computer system. The out-of-state list shows 43 states.

9. Other data shows continued out-of-state business thereafter, and no "abandonment" of out-of-state business. These data, culled from old records such as sales slips, catalog orders, packing slips, and the like for various years up to 1980 show varying numbers of states plus D.C., up to 49.

10. Some interstate sales are the result of mail or phone orders on an ad or from a catalog or brochure or otherwise. Some are of apparel bought at one of the stores in New Jersey and shipped by Roots out-of-state on the buyer's instructions. Others are sales in New Jersey to out-of-state customers coming in to buy. Mr. Root re-

called one he had served personally not long ago. All three kinds are treated as interstate transactions.

11. Exact data to completely tabulate interstate sales by dollars, number of items sold, number of transactions, number of customers, and so on, simply do not exist. The records are not kept in that form. Natural's expert witness, Mr. Boiko (an accountant), attempted an analysis but the underlying data he was given was incomplete. For example, 1976 was the only calendar year for which he had out-of-state sales slips for all Roots credit card customers for all months. For sales on other credit cards (American Express, Bank Americard, Mastercharge) and cash sales, he had sales slips only for November and December and only for the Red Bank store. The information on the documents he had was listed by entry into a computer and a tabulation made, see Exh. P–140. As shown by Exhibit D thereto, he had only 951 sales slips for 1976, but for 1977, for which he did not have all months and no slips for non-Roots credit cards or cash, he had 2,740 sales slips. In any event, with his limited data he calculated or estimated that out-of-state sales ranged from 1.575% (for December, 1973) to 2.823% (for 1977 calendar). Mr. Root estimated the out-of-state sales to run about 5% of total based on his familiarity and observations over the years. Either way, the fact is that the number of out-of-state customers is modest and that the interstate sales are a fraction of the total business, as found in the preliminary injunction decision dated December 4, 1979. The inspection of many thousands of records, their analysis and tabulation, has not altered these basic facts.

12. The name or mark "Roots" as employed in the context of this case is distinctive or unique, and not primarily a surname. So far as any witness in the case knows, no one but Natural and Roots has used it in the United States for apparel. Irwin Green so testified in the deposition segment marked in evidence. Don Green so testified at the preliminary injunction hearing, though he said there was a cloth-

ing manufacturer in Canada called Roots (Tr. 11/2/79, p. 119, lines 11–12), and also that it is not merely a surname (Idem, lines 15–17). No one in the Natural structure has the name Root or Roots.

13. Natural learned of the existence of Roots and of the nature of its claimed business activity "at least as early as" June, 1977 when the trademark cancellation petition was filed and served (Complaint, par. 10 and Exhibit C to the Complaint) [The testimony about 1975 communications is not covered here].

14. Up until the marketing of shoes through Saks in 1977, Natural sold all its shoe production through a system of complete vertical integration from factory to consumer, through so-called "company stores" (owned 50% each by Green and Budman, evidently through separate corporations) and "franchise" stores, whether in Canada, in the U.S., or in Amsterdam or Munich. The only intermediary seems to have been Century Importers, mostly owned by Green and Budman, with Green's father (who evidently operated the company) holding 4% of the stock, to handle import duties, customs brokers, and the like.

15. No shoes but Natural's were allowed to be sold in any of the retail stores, and such other minor items as they carried were controlled by Natural and marked "Roots", though provided by others directly to the stores and thus not reflected on Natural's books. "Rain and Stain" was supplied by Cadillac Shoe Products of Detroit; "Saddle Soap" and "Mink Oil" were supplied by Harry Hoffman in Milwaukee. (Tr. of 11/1/79, pages 76–77). Leather bags were made in England; scarves were made in Europe, and sold directly to the stores. T-shirts were made in Berkeley and sold directly to the stores (Tr. of 10/24/83, pages 4.97–4.98).

16. Natural itself has never used "Roots" as part of its corporate name, but only as a trademark on shoes and other goods made by it or supplied by others at its request. There is testimony that the company and franchise stores in the U.S. used the name "Roots" on their signs, as "Roots Natural Footwear" but none is a party and there is no document or summary of corporate titles in evidence.

17. The first time Natural sold wearing apparel categories as "cotton-wool sweaters, corduroy and velvet sports suits and pants, tweed sports coats, cotton shirts, outerwear and wool jackets" (as described in paragraph 7 of Mr. Green's affidavit filed in 1979 in opposition to the preliminary injunction) was the sale to Saks for retail offering in the Fall of 1979 through three stores in New York, Michigan and Illinois.

18. No such merchandise provided by Natural (whether made by it or others) bearing the mark "Roots" had previously been marketed through any but the vertically integrated channels down to the retail stores, described in item 14 above.

19. At the time Natural first sold shoes with the mark "Roots" to Saks in 1977, or shortly thereafter, it never told Saks about the trademark cancellation petition it knew was pending then and since.

20. When Natural later began to sell shoes under the mark "Roots" to other retailers such as Bloomingdales, Macy, and others, it never told any of them of the pendency of the trademark cancellation petition.

21. None of the managers of retail stores in the vertical integration scheme in the U.S. was ever told (while in existence) of the pendency of the trademark cancellation petition.

22. As late as December, 1979, when the preliminary injunction against sale of wearing apparel other than shoes took effect, Natural did not tell Saks or any other retailer, including its own company and franchise stores, of the pendency of the trademark cancellation petition.

23. Natural's North American sales manager, Marshall Myles, was not aware of the present lawsuit (filed by Natural) until April, 1982 when he was noticed for depositions. He was not aware of the existence of the trademark cancellation proceeding as to footwear until Roots' counsel

asked him about it "just now" (on the morning of October 28, 1983). He was told by Green and Budman, when the leather jackets were returned from Saks in 1979, that there was a problem with the name Roots in the U.S. as to clothing. He has never mentioned the subject or "problem" to other stores such as Macys or Bambergers. He has never been given a copy of the December, 1979 preliminary injunction order. Richard Kowalewski was never informed of a conflict with the name Roots in the U.S., nor was he told anything until the Summer of 1983 (some 3.5 years after the preliminary injunction), see 10/19/83 Tr., p. 1.181.

24. Since the December, 1979 preliminary injunction Natural has made no sales of wearing apparel (except footwear) to the U.S. under the name Roots or any other name, except a small quantity supplied to the Michigan store under the name Don-Michael. Mr. Myles, Natural's sales manager, was instructed by Don Green not to sell to Natelson's, a Red Bank, N.J. store, until the law suit was over.

25. The major advertising effort by Natural in the U.S. on a national scale was the effort made through the Lord, Geller advertising agency in the latter part of 1975, at which time Natural's product was the negative heel, modified Earth shoe or health shoe then sold only through Natural's own vertically integrated stores. After the popularity of that shoe in the U.S. waned, and production shifted to what the testimony called leisure shoes aimed at a different and larger segment of the population, and the marketing channels shifted to those of established retail chains, such as Saks, and independent shoe stores (all of whom were not limited to Natural's product alone), the national advertising largely took the form of ads placed by those retailers to offer those shoes, and this began in 1977, with most of it going on after Natural was aware of Roots' petition to cancel the U.S. registrations of "Roots" for footwear.

*The Expert Witnesses.*

Albert Resnick, a Canadian chartered accountant (equivalent to a U.S. CPA), is with a firm that has served as Natural's outside accountant from 1974 on. His testimony was to present figures for Natural sales into the U.S. from 1973 through 1982, as well as advertising expenditures. He described the structure as consisting of Natural Footwear, owned 50% each by Green and Budman, with Century Importers as the American agent for export to the U.S., and owned 48% each by Green and Budman and 4% by Irwin Green (father of Don). There were many corporations formed in the U.S., each owned 50% each by Green and Budman and named "Natural Footwear of Detroit", or Idaho, or whatever geographic area each covered.

Sales by Natural into the U.S. were through Century from the beginning until early 1979 when the use of Century was discontinued. The figures are not appreciably different from those available at the time of the preliminary injunction hearing for the period until then, but the figures were supplemented through 1982.

The exhibits introduced through Mr. Resnick disclose the general levels and trends outlined in the first part of this opinion, with sales for 1975 being the peak (this was when only the negative heel shoe was made) and thereafter at declining levels, with fluctuations. The extent and timing of the phasing out of sales of negative heel shoes and the growth of traditional type shoes is not evident in any precise way, although the evidence as a whole indicates that the decline had begun in 1976, and the change began in 1977 with the first sale of leisure shoes to Saks. The only reliable indication is in the pace of closing of the vertically integrated stores, but there are no separate figures by store, and such state-by-state figures as were tabulated do not distinguish between the two distinct kinds of shoes.

The figures for U.S. advertising were developed from lists provided by a bookkeeper at Century, not under the witness' supervision. Mr. Resnick compared the list

entries against check stubs, at least in some cases, as the only kind of verification he could make.

The list of Century checks for advertising for 1975 (when the Lord, Geller program was under way) was of the order of nearly $300,000. Lord, Geller's name appeared repeatedly in the check stubs, one being to Lord, Geller of Puerto Rico, but as he did not have the invoices he could not tell what the payment was for. For a post-audit review of expenditures, Mr. Resnick would prefer to see the cancelled check with bank stamps and the corresponding invoice, rather than the check stubs alone. One Lord, Geller invoice to Century was for preparing a Canadian script version, but whether Century was reimbursed for that item does not appear.

The only figure for U.S. sales of shirts, sweaters, jackets and pants (i.e. clothing) of any significance is for some $52,000 in 1979, which is largely the sale to Saks that prompted the application in that year for the preliminary injunction. For 1980 the category shows a negative $4,500., reflecting returned goods, and thereafter zero.

The Resnick testimony tended to confirm what was evident, and what was found, from the record on hand at the time of the injunction hearing in 1979, updated it, provided more detail, but did not alter the broad outlines then evident.

Steven Osterweis, a consultant in retail marketing, with experience working with Gimbel Bros. and related stores, and since leaving has revived the Institute of Retail Merchandising as part of the business school at NYU, and has done consulting work, testified as an expert in retail merchandising.

He examined a variety of materials pertinent to Natural's business activity, including its advertising efforts. Most of what he examined was received in evidence either before or after he testified; some was not but the items not in evidence are not considered critical or important enough to require striking any part of his testimony.

His opinion was largely one of impression rather than detailed study and analysis. He read some materials, such as the pleadings (and the cancellation petition) for background. Other items such as customer letters, ads, invoices and the like he went through quickly to get an overall view.

He expressed opinions as to both Natural and Roots.

As to Natural, his opinion was that in the early years, 1974–1976, the company had a clearly defined objective of penetrating the U.S. market through the network of its stores, aimed at the market segment interested in the negative-heel shoe. Their advertising and merchandising effort was aimed at that goal and segment. There was one major effort in television media, and very little effort in direct merchandising. The identification was through the store locations.

This objective and effort changed, moving away from their own stores to selling through department and specialty stores with many branches, some buying centrally and others on a divisional basis. There was no information for deciding whether every branch was supplied with a full line or not, and for a store with the full line fewer units would be expected to sell in the smallest and largest sizes, on the usual Gaussian or bell curve.

He considered that by 1976, Natural had achieved the objective of having a national reputation in major markets in the United States for the original modified earth shoe, and that thereafter it changed channels to those largely of department and specialty store accounts. He did not try to put this into quantitative terms as he did not know what proportion of the population was served, but the geographical spread was national.

He also reviewed like materials about Roots, and concluded that it was an excellent store with a rather clearly defined marketing thrust with certain types of merchandise. Taking into account the amount of sales and the pattern of advertising, he did not believe there was evidence to sup-

port a contention of its having a national reputation beyond that of a local retailer. He made no analysis of his own but looked to the tabulations prepared by Mr. Boiko (Exh. P–140). He visited the Summit store shortly before testifying and confirmed the view and impression he had that it was a high quality specialty store with a substantial amount of Roots labelled items, some combined with the manufacturer and others with Roots alone.

The percentage of out-of-state sales to total sales is a measure of national reputation but not the only measure. It is possible to have a national reputation and to sell throughout the U.S. even though such sales are a small percent of the total business.

He felt the figures in Exh. P–140 showed too small an absolute volume of sales out-of-state to indicate enough penetration in relation to the size of the market, though he had only a general impression, not a statistic. He had no way of evaluating the cumulative effect of out-of-state sales over a period of years but did not think this would be a significant element in developing an acceptance and maintenance of a reputation for a name.

When he joined Gimbels in 1947 or 1948, the New York store probably had something close to a national reputation. He knows Harrods, the London department store, and believes it has achieved a reputation among the top 10% to 15% income bracket of the population in major cities of the U.S. although it has no stores or warehouses in the U.S. and does very little advertising here, plus some joint public relations activities jointly with some U.S. stores with promotions of British goods from time to time, as well as London promotions of U.S. goods in the Harrod's store.

In discussing what was called "direct marketing" or mail and phone sales from occasional catalogs, he said that Hammacher Schlemmer was a pretty good example. Hoffritz he regarded as relying on mail sales to a lesser degree.

The Roots ads in the New Yorker would be consistent with a national reputation but it seems to have ended around 1966. If it went on beyond that time he would change his opinion.

John A. Boiko, a CPA, testified to explain the counts and tabulations made to prepare Exh. P–140.

For the study of the two months in late 1973 and early 1974, he had copies of monthly statements to customers with Roots credit cards. For the first of the two months, names from A through C and T through Z were not included and he had 3,000 statements. For the second of the two months he had all names, and there were 7,000 statements. These were manually segregated as New Jersey or out-of-state and the out-of-state ones listed for a computer run to identify the states, number of customers, dollar amount and so on. The counts are set out on Exh. B and C of Exh. P–140.

Similar analyses of out-of-state sales shown by sales slips were made for 1976, 1977 and 1979 using such slips as were provided. Mr. Boiko did not review all the sales slips available to Natural, or packing slips, but used what he was handed.

For 1976, he had 951 out-of-state sales slips. For 1977 he had 2,740 slips. Due to limited time he was given none for 1978. For 1979 he had 1,351 sales slips.

Calculations were then made on the basis of such statements as were available in the two months of 1973–1974 to establish percentages shown by the samples in relation to total sales and these were extrapolated or estimated. Similar calculations were made for sales slips analyzed from 1976, 1977 and 1979.

The final tables show ledger entries for Roots for various advertising expenses from 1965 through 1977.

Various other witnesses, such as Mr. Osterweis used these tabulations as presented but did not check any underlying data. A number of errors were brought out in the examination of Mr. Boiko. Such errors appear to be of the type which are inevitable

with any clerical operation, especially when the data on hand has no corresponding reference source for proofing or test for error. All the tabulations relating to sales are based on limited samples in the selection of which Mr. Boiko had no part.

Henry Assael, a professor of marketing at NYU with a doctorate from Columbia in business administration testified with his opinion in regard to Roots' marketing and its national reputation based on its total marketing strategy.

His definition of achieving a national reputation was based on various criteria such as the national advertising strategy, the existence of direct mail campaigns, the sales made out-of-state, the use of regional warehouses, the use of multi-store outlets out-of-state, and the like.

His opinion was that what he saw of the Roots operation indicated an activity typical of a local retailer of very high quality, with quality merchandise and a quality reputation in Northern New Jersey, possibly the State of New Jersey, that may cross the State line into New York.

It is possible to successfully achieve a national reputation without having out-of-state warehouses and stores, but there must be at least one of his criteria to meet his definition such as a national advertising campaign.

Word-of-mouth communication plays an important role in building a reputation. It is more important for quality attire than for other industries. Examples are Texas based Neiman Marcus, Arizona based Goldwater's, Chicago based Marshall Field.

It is possible to achieve national reputation with zero advertising. Hershey is the classic example, and is based on wide distribution and high quality.

Customer loyalty for soap products decays more quickly than for fashion goods. Awareness can be achieved with a concentrated campaign, and the reputation so established can then be sustained with lesser efforts as well as by repeat sales.

To achieve a national reputation, he felt the borderline minimum needed for a na-

tional advertising campaign would be about $4. million, and to sustain such an expenditure, the corresponding sales would need to be about $100. million.

*Ultimate findings of fact and Conclusions.*

The complete trial record is massive and contains extensive detail about both Natural and Roots. All of it has been carefully reviewed. From the evidence taken as a whole, the major aspects appear quite clearly and without doubt.

Roots was well established as a business, and its name had come to firmly identify its goods as a common law trademark by 1965 when the going business was acquired by HS & M late in that year. As between the Roots family in the business, and HS & M, the name was sold along with the going business for the retail sale of wearing apparel, including shoes, and the newly formed subsidiary, Roots, Inc. acquired the intangible rights that accompany the mark and tradename. The business since then has grown steadily, and while the bulk of sales take place at the New Jersey stores, there was a conscious and deliberate effort to extend the recognition of the name and mark, and the sale of goods with that mark, throughout the United States, both before and since that sale. While the percentage of out-of-state sales is a fraction of store sales, the business is there, it is steady and it has grown. The tabulation of Exh. D to Exh. P–140 illustrates the difficulty of making precise measurements. One witness thought the growth of sales from 1976 to 1977 to New York customers was an indication of the opening of the new store in Riverside Square in Hackensack. Those sales to New York addresses more than tripled from $36,000. in 1976 to $118,-000. in 1977. But the same table shows a tripling of sales to California and to Connecticut, a near tripling to Florida and Maryland, more than triple to Massachusetts, and more than double to Virginia, none of which areas could conceivably be directly affected by the Hackensack store opening.

In fact, the major correlation from those tables lies in the dollar amount of sale per sales slip, and so the figures reflect no more than the availability for the tabulation of fewer or more sales slips.

For 1976, there were sales of $72,840 reflected on 951 sales slips for an average of $76.57 per slip. In 1977 there were sales of $198,175. shown on 2,740 slips, for an average of $107.65 per slip. For 1979, the sales totalled $105,301. for 1,351 sales slips for an average of $77.94 per slip.

Thus, what may seem to be an ebb or flow of dollar sales to one or another state is most likely no more than a function of the number of sales slips that could be found, or of those found, that were provided to Mr. Boiko for analysis. That there were as many sales slips for that period still in existence is somewhat of a surprise, and the same is true of packing slips and customer charge accounts, since these are ordinarily not kept very much longer than needed for adjusting customer accounts and settling differences. It is also quite clear that what still existed was less than all that were written at the time, and the cost and labor of attempting any kind of complete reconstruction would be prohibitive and far beyond the value of the lawsuit on either side, let alone both.

The incompleteness does not matter. What is there wholly corroborates the testimony of Perry Root, who conceived the notion of building up the Roots reputation and extending it by sales as far as he could, and such records as there are fully support his testimony that he has achieved, and continues to achieve, that goal. No one will ever know what the no-longer-existing sales slips and other transactions would have shown. The ones that do exist have made a corroborating showing and what they write cannot be erased.

The opinion of Dr. Assael about the criteria he has set to measure "national reputation" is not pertinent to this case. This finding in no way questions his qualifications or the academic theories of marketing he presented. They are not pertinent simply because his criteria are attuned to a much different order of magnitude of activity in the entire U.S. market than is here involved. Neither side has engaged in an advertising campaign remotely approaching $4. million, and the best year of Roots involved gross sales slightly more than 10% of the $100. million he felt was needed to support the $4. million expenditure. His criteria obviously relate to mass marketing of some product in very large volume that would represent some significant share of the total market. The data from the *Brown Shoe* case, and from the Statistical Abstract, indicate that both Natural and Roots together would be no more than a mere decimal point figure of the total for wearing apparel or shoes, taken separately or together.

The very nature of the activity chosen by Perry Root forecloses any such mass marketing levels. The basic object has been to offer wearing apparel of the highest quality, style and fashion to customers interested in such goods and who are found in the higher economic levels of the population. Such merchandising methods are aimed at a relatively small number of buyers in the general population who are sought as steady, long-term customers likely to have a strong loyalty to the brand, the service and attention which accompany the method.

In this context, large numbers are not to be expected any more than they can be for like "up-scale" goods of other categories, such as automobiles, furniture, china, glassware, cutlery and the like.

An excellent example is found in the ceramic reproductions of flowers and birds produced by the world famous ceramist, Susan Dorothy Doughty (1892–1962) who produced her work in limited edition from 1935 through the Royal Worcester Porcelain Company in England. See Encyclopaedia Brittanica, 15th Ed., under "Doughty" and under porcelain bird figures, 14:917e. Her works are known as "Dorothy Doughty birds" and although the number of items made was not very large there can be no doubt that she achieved international identification for her name and mark, fully

entitled to protection, without mass marketing and without $4. million publicity and advertising campaigns. To have attempted any such program would have been to create a demand that could not be met. This is so well known as to warrant taking judicial notice of it.

Nor is there any evidence of abandonment of the Roots mark in favor of the mirror R logo. Before Natural came into existence the mirror R appeared as a stylistic element of the border surrounding the name Roots, as on the catalogs as far back as 1956 and thereafter, see Exh. CC–49 (1956); Exh. CC–50 (1960); Exh. CC–51 (Fall, 1961); Exh. CC–52 (Christmas, 1961), for example. It appears in a different stylized form as a mirror R logo together with the name Roots on Exh. CC–56 (1968) and Exh. CC–57 (1969), for example, and another version uses the same stylized mirror R as a double R for the first letter of the mark Roots, as on Exh. CC–58 (Fall, Winter, 1973) and thereafter. The most recent catalog, Exh. CC–79 (Christmas, 1983) shows the same combined use on the cover and on the private brand labels of shirts pictured within the catalog.

Thus, the only evidence shows that the mirror R has been and is used as a logo along with the name Roots, as on the catalogs noted and on the gift box, Exh. CC–81, and also as the first letter of Roots. There is not the remotest suggestion of abandonment of Roots as a mark, and it has also been part of the corporate business name at all times to date.

■ Thus, the evidence as a whole clearly and convincingly shows that Roots had established and continues to enjoy unique identification for the wearing apparel (including shoes) sold by it as a merchant, both as a tradename and as a trademark, mainly in New Jersey but throughout the United States as well, long before Natural's first shipment of shoes to California in late December, 1973. Roots is undoubtedly the senior user.

The opinions of the experts, Osterweis and Assael, are not persuasive. Both are no more than casual, off-the-cuff views with not much beyond a superficial exposure to the underlying facts. This is not the fault of either expert, but is the inevitable consequence of gathering large masses of records and then finding it too expensive to have the experts review more than a bit of it here and there. The opinions expressed are also weakened in the assistance provided because both Dr. Assael (mentioned above) and Mr. Osterweis were using criteria applicable to very large scale businesses rather than small ones. Nothing in the common law of trademarks, or in the Lanham Act, limits the protection of the intangibles arising from the use of a well-established and strong mark, such as here, to large enterprises. Small enterprises as well as massive ones are equals in the eyes of the law.

It is undeniable that Roots had engaged in soliciting and achieving sales of its goods, under its name and mark, throughout the United States long before Natural began, and under no theory or principle could Natural, the newcomer, expect to bar or preclude business activity already engaged in regularly and without interruption. This is especially so because Natural began with a very specific and single kind of shoe, the negative heel Earth shoe for which there happened to be a fad at the time. Like the hula-hoop, that fad is largely gone and Natural seeks not only to redirect its effort into traditional shoes of the leisure type, but also to claim exclusive right to Roots' mark (but only for stores outside New Jersey) for all kinds of wearing apparel as well. The position is inherently inequitable and cannot be sustained on the evidential record.

Since Natural and Roots deal in competing goods, it is hardly necessary to look beyond the name or mark itself, see *Interpace*, 721 F.2d at 462. Since Roots had long been distinctive for the goods it sells, the likelihood of confusion is evident from the identity between them, and see *Interpace* 721 F.2d at 463, [6] citing the *American Plan* case as observing that: "Where the names are identical ... the names in

themselves are evidence of likelihood of confusion."

Also, in the allegations of its own complaint here, Natural has alleged the likelihood of confusion and, while it did not seek to prevent Roots from using its own name and mark as it had been (i.e., in its New Jersey stores and nationwide by mail) and only sought to prevent it from opening stores outside New Jersey, it can hardly take the diametrically opposed position and claim no likelihood of confusion as a matter of fact.

There is also evidence of actual confusion. The witness Hahn testified on May 4, 1982, to having received from newspapers tear sheets of ads for "Roots" shoes made by Natural (5/4/82 Tr., pp. 264–265; pp. 294–295). The witness Potente (who had been advertising manager and secretary to Mr. Root before Mrs. Hahn) testified on June 3, 1983 that in around March, 1975 she first saw an ad by Natural for a negative heel shoe with the name "Roots" (6/3/83 Tr. p. 41). She also testified that in June, 1975 she received more than 50 phone calls from persons seeking information about shoes, or wanting to order shoes, advertised by Natural's store in New York (6/3/83 Tr. pp. 75 to 79). She reported all of this to Mr. Root, and heard his side of a conversation with the owners (Natural) in which he told them that their ads were causing confusion among Roots customers, that Roots had prior use of the name and urging them to discontinue using it. She typed the letter of June 20, 1975, Exh. CC–16. She also received tear sheets of Natural ads from the New York Times and was billed for Natural's ads, and this had to be corrected. (6/3/83 Tr. pages 79–92). The exhibits, which run from March to December, 1977, are Exh. CC–27 through 31, are the tear sheets with the witness' notes on them. Further testimony along the same lines was adduced on cross, including the fact that the first four ads (CC–27, 28, 29 and 30) were published between March 16 and April 13, 1977 (just before Roots filed its petition for cancellation), and the fact that Mr. Root's phone call that she heard was to Toronto to a

Richard Greenspan or Green (7/7/83 Tr., pages 63–74). Don Green's brother is Richard.

In its decision on the preliminary injunction, the court found the evidence then to show that Natural was aware of Roots' protest and objection from 1975, when Exh. CC–16 was sent to Mr. Novak. That finding was confirmed on the whole record in view of the Potente testimony, the further testimony by Mr. Root, the evidence from Exh. P–175 and its notations, all of which was met only by "no recollection" on the part of Mr. Budman. Mr. Green did not testify again after the preliminary hearing, and an offer of Natural's of some deposition testimony he gave was objected to as he was not shown to be unavailable.

Aside from that, the evidence on the entire record on this point strongly confirms that Natural's development of the new retail distribution channels for shoes, from its own stores to department and specialty stores and independent shoe stores, as well as the 1979 clothing effort that sparked the application for an injunction, was an intentional and deliberate effort to degrade Roots' position and capture the name and mark for its own.

This warrants not only permanent injunctive relief but the equitable remedy of accounting for profits, discussed later in connection with remedies.

The conduct complained of is clearly unfair competition in the sense discussed above, and since the injury is irreparable, Roots is entitled to injunctive relief.

The evidence that Green and Budman kept their knowledge of the petition to cancel the trademark registrations for shoes to themselves, never telling any of their own or franchised store managers, or buyers at stores like Saks, Bloomingdales or Macy, or the Kowalewskis, or even their own North American sales manager, is startling.

It may be that the concealment of that knowledge protected their customers from the risk of joinder as parties and of accounting for retail profits from their own sales due to lack of knowledge, but it also

rather obviously enabled Natural to obtain orders that buyers might have refrained from placing had they known, just as Saks preferred not to become involved in the present lawsuit when the preliminary injunction prevented the sale of wearing apparel other than shoes.

It must be emphasized that nothing about the cancellation petition or this suit in any way prevents Natural from selling shoes, other wearing apparel or any related goods in fair and open competition. The only impact is to prevent unfair competition by the wrongful use of Roots' name and mark.

*Remedies*

1. The non-final order of September 8, 1983 will be made final by including it in the final judgment, with direction that Natural's registrations be cancelled.

2. A permanent injunction will be granted forbidding the Natural parties, and all others who can be affected by the injunction under F.R.Civ.P. 65 from using the name or mark "ROOTS", or any colorable imitation thereof, on or in connection with the manufacture, sale, offering for sale or advertising of wearing apparel (including shoes) and haberdashery goods and accessories related thereto, whether as a tradename, business name or trademark, anywhere in the United States.

3. Because there is inventory in existence in the hands of non-parties who have not been informed of the litigation, they will be allowed to sell that inventory at retail even though it carries the mark "ROOTS" without violating the injunction but they are not to use "ROOTS" in any advertising of any kind. Orders already placed with Natural and in production for future delivery may be filled but Natural shall not fill any orders received after the date hereof with goods marked "ROOTS".

4. Natural will be required to account for profits. In balancing the equities, the accounting shall run for profits on goods sold into the United States for the second half of 1977 and for all years since until the date when the name ROOTS is eliminated from goods produced. In the case of the more recent models of shoes not using molded soles, this can be changed as quickly as new dies for branding the soles and inner heel liner can be made, and boxes changed. For the shoes with molded soles, either the molds must be altered to remove ROOTS or else be replaced with new ones.

5. The word "ROOTS" is to be deleted from all letterheads and other printed matter, including flyers, stuffers and the like, forthwith.

6. From what the court has seen of the documentary exhibits, a formal accounting will be quite expensive, time-consuming and the source of considerable controversy. In an effort to provide a means for practicable resolution, it is suggested that, if the parties agree, the accounting take the form of ascertaining from Natural's books and records, the amount of its gross sales into the United States (see e.g., Exh. CC–67) and applying to that the 20% markup testified to by Mr. Green, and taking that figure as gross profit from sales to the United States. From each year's *total* figures, a ratio can be developed in the aggregate between net profit after tax and gross profit. That ratio can then be applied to the figure determined as gross profit on the sales in to the United States. The chartered accountants in Toronto can prepare the data and submit it to an independent accountant designated by the magistrate for review, correction and adjustment, and the magistrate can then submit to the court a report and recommendation thereon.

7. Costs are allowed, but the court lacks authority to allow attorneys fees, as requested. While the case is doubtless an "exceptional one" in the sense of 15 U.S.C. § 1117, because of the knowing and deliberate nature of Natural's misconduct and its concealment from everyone in and out of the company of the pendency of the cancellation petition and the litigation, the authority of § 1117 extends only to a case where the infringed mark is registered, and Roots did not have a registration. There are cases elsewhere allowing attorney fees

in like circumstances to cases coming within 15 U.S.C. § 1125, but none is in the Court of Appeals here, and the authority to award does not clearly appear as a matter of law.

8. Since the obligation to account for profits is decided but the amount remains to be settled, the judgment will contain the express findings and directions specified by F.R.Civ.P. 54(b) to make clear that appeals from all aspects except the open matter of the amount of profit can be taken now. The former provision of 28 U.S.C. § 1292(a)(4), allowing appeals from judgments in actions for patent infringement which are final for all aspects except accounting is not drawn to cover trademark cases, and is now 28 U.S.C. § 1292(c)(2), governing appeals to the U.S. Court of Appeals for the Federal Circuit. Natural wanted to appeal the non-final judgment of September, 1983 but could not, and now that trial is completed should be allowed to proceed without delay. The provision to be included will insure this. Compare *Cobbledick v. U.S.*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940); *In re Grand Jury (Appeal of TRW)*, 638 F.2d 1235 (CA-3, 1981).